## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MAINE DEPARTMENT OF EDUCATION,

      Defendant.

Case No.

## <u>COMPLAINT</u>

The United States brings this civil action pursuant to Title IX, 20 U.S.C. § 1681 *et seq.*, for declaratory, injunctive, and damages relief.  The United States alleges on information and belief as follows:

## INTRODUCTION

The State of Maine, through its Department of Education, is openly and defiantly flouting federal anti-discrimination law by enforcing policies that require girls to compete against boys in athletic competitions designated exclusively for girls.  This discriminatory practice violates the core protections of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, which guarantees equal educational opportunities for all students, regardless of sex.  By prioritizing gender identity over biological reality, Maine's policies deprive girl athletes of fair competition, deny them equal athletic opportunities, and expose them to heightened risks of physical injury and psychological harm.

The undeniable physiological differences between males and females provide boys with inherent advantages in strength, speed, and physicality that pre-determine the outcome of athletic

contests.  These differences are precisely why Title IX and its implementing regulations, *e.g.*, 34 C.F.R. Part 106 and 45 C.F.R. Part 86, permit and encourage sex-separated sports to ensure girls have an equal opportunity to participate, excel, and reap the educational benefits of athletics. Yet Maine's policies flout this core Title IX principle by allowing boys to compete in girls' sports without regard for these biological realities.  The results are stark:  girls are displaced from podiums, lose opportunities for advancement to regional and national competitions, and miss out on critical visibility for college scholarships and recognition.

This discrimination is not only unfair but also demeaning, signaling to girls that their opportunities and achievements are secondary to accommodating others.  It erodes the integrity of girls' sports, diminishes their competitive experience, and undermines the very purpose of Title IX:  to provide equal access to educational benefits, including athletics.  Despite repeated warnings from the United States Department of Education, the Department of Health and Human Services, and the Department of Justice, Maine's leadership has doubled down, publicly declaring defiance with statements like "We'll see you in court."  The United States accordingly files this action to stop Maine's unapologetic sex-discrimination against female student athletes.

## NATURE OF THE ALLEGATIONS

1. The United States brings this action to enforce Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the implementing regulations of the United States Department of Education, 34 C.F.R. Part 106, and Department Health and Human Services, 45 C.F.R. Part 86.

2. Defendant MAINE DEPARTMENT OF EDUCATION's policies and actions are harming girls by denying girls the opportunity to compete in student sports on a level playing field in which they have the same opportunities as boys.  Defendant's athletics policies and

practices unfairly force girls to compete against boys in competitions designated for girls. These policies and actions discriminate on the basis of sex and harm female student athletes under Defendant's educational charge.

3. Title IX's core purpose is to ensure that both boys and girls have equal educational opportunities. This includes ensuring both sexes have an "equal athletic opportunity" to participate in school athletic programs. *See* 34 C.F.R. § 106.41(c); 45 C.F.R. § 86.41(c).

4. The inherent physiological differences between the two sexes make them generally dissimilarly situated in athletics. These physiological differences exist regardless of how a person identifies.

5. Because of these physiological differences, providing athletic teams, competitions, and events for girls has long ensured that female student athletes are afforded an equal, and equally safe, opportunity to participate and effectively compete, and thereby to enjoy the same educational benefits from sports as boys.

6. Defendant continues to violate federal law. Despite Title IX's equal opportunity mandate, Defendant has adopted and implemented a policy that forces girls to compete against boys—despite the real physiological differences between the sexes—if the boy asserts that he is a girl.

7. Defendant's adopted and implemented policy intentionally denies and has the effect of denying girls equal athletic opportunities.

8. The United States accordingly seeks a judgment granting declaratory, injunctive, and damages relief for Defendant's violations of Title IX and the federal funding contracts it signed promising to comply with Title IX and its implementing regulations.

## PARTIES

9.  Plaintiff is the United States of America.

10.  Defendant MAINE DEPARTMENT OF EDUCATION ("MDOE") is an agency of the State of Maine that administers both state education subsidy and state and federal grant programs; coordinates the authoring of the rules for Maine state education statutes passed by the Maine State Legislature; provides professional development, information, supports and resources, as well as a system for educator credentialing; and leads many collaborative opportunities and partnerships in support of local schools and districts.

11.  MDOE is a current and past recipient of federal funding; MDOE distributes that federal funding to public and private local schools.

12.  All MDOE's operations constitute an educational program or activity within the meaning of Title IX.

## JURISDICTION AND VENUE

13.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, because this action arises under federal law and the United States is the Plaintiff.

14.  The United States is authorized to initiate this action under 20 U.S.C. § 1682.

15.  Declaratory and injunctive relief is sought as authorized by 28 U.S.C. §§ 2201 and 2202.

16.  Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391(b) because Defendant resides in Maine, and a substantial part of the events or omissions giving rise to this claim occurred in this judicial District of Maine.

**FACTS**

**A.  TITLE IX IMPLEMENTING REGULATIONS**

17.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.

18.  The regulations of the United States Department of Education ("USDOE") implementing Title IX ("Implementing Regulations") are codified at 34 C.F.R. §§ 106.1-106.82.

19.  The regulations of United States Department of Health and Human Services ("HHS") implementing Title IX are codified at 45 C.F.R. §§ 86.1-86.71.

20.  The HHS's regulations implementing Title IX are substantially the same as USDOE's Implementing Regulations.  *Compare* 34 C.F.R. §§ 106.1-106.82, *with* 45 C.F.R. §§ 86.1-86.71.

21.  The Implementing Regulations provide that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance."  34 C.F.R. § 106.31(a); 45 C.F.R. § 86.31.

22.  Title IX and the Implementing Regulations use of the term "sex" means biological sex; the term "sex" does not mean gender identity.

23.  Consistent with "sex" meaning biological sex in Title IX, the President of the United States issued on January 20, 2025, Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," and issued on February 5, 2025, Executive Order 14201, "Keeping Men Out of Women's Sports," which both confirmed the definition of the term "sex" for Title IX:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

. . .

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

24. The Implementing Regulations include a regulation particularly explaining Title IX's application to athletics ("Athletics Regulation"). 34 C.F.R. § 106.41; *accord* 45 C.F.R. § 86.41.

25. The Athletics Regulation first declares a general prohibition of the use of sex in athletics, providing that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a); *accord* 45 C.F.R. § 86.41.

26. The Athletics Regulation then provides a limited exception to that general prohibition by allowing some separation by sex, namely that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon

competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b); *accord* 45 C.F.R. § 86.41(b).

27.  Because such separation cannot disadvantage either sex, the Athletics Regulation requires that if an educational program separates teams by sex, the teams that the program designates as female teams must be completely separated by sex. *See* 34 C.F.R. § 106.41(b); *accord* 45 C.F.R. § 86.41(b).

28.  The Athletics Regulation provides a single qualification to the exception for complete separation of female teams by sex, namely that "where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport." 34 C.F.R. § 106.41(b); *accord* 45 C.F.R. § 86.41(b).

29.  The Athletics Regulation also provides that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); *accord* 45 C.F.R. § 86.41(c).

30.  The Implementing Regulations provide that funding recipients must comply with the Implementing Regulations regardless of "any rule or regulation of any organization, club, athletic or other league, or association which would render . . . student ineligible to participate or limit the eligibility or participation of any . . . student, on the basis of sex, in any education program or activity operated by a recipient and which receives Federal financial assistance." 34 C.F.R. § 106.6(c); *accord* 45 C.F.R. § 86.6.

B. **DEFENDANT'S DISCRIMINATION AGAINST GIRL STUDENTS IN ATHLETICS**

1. ***MDOE's Control over School Athletics and Obligation to Ensure Equal Athletic Opportunities***

31. Maine state law charges MDOE with control over schools, including over school athletics, and obligates MDOE to ensure equal athletic opportunities for girls.

32. MDOE is responsible for supervising and guiding all public schools, coordinating a system of public education, and enforcing applicable regulatory requirements, providing educational leadership for the state, and other rules. *See* Me. Rev. Stat. Ann. tit. 20-A, §§ 201, 202, 251-A, and 255.

33. MDOE's authority includes general supervision over all public schools, and advising and directing superintendents and school boards in the discharge of their duties. Me. Rev. Stat. Ann. tit. 20-A, § 254.

34. All Maine public schools and all Maine private schools that receive public funds are required to follow directives and guidelines from MDOE demonstrating adherence to regulatory requirements and other rules. *See* Me. Rev. Stat. Ann. tit. 20-A, § 258-A.

35. Schools must also submit to MDOE reports and comprehensive education plans demonstrating compliance with various statutory and regulatory requirements. *See* Me. Rev. Stat. Ann. tit. 20-A, §§ 4502, 4504, 258-A.

36. MDOE's authority includes the power to require schools to submit documentation and data showing adherence to state and federal requirements. 05-071-125 Me. Code R. § 4.

37. In 2021, Maine amended its Human Rights Act to declare that "[t]he opportunity for an individual at an educational institution to participate in all educational, counseling and vocational guidance programs, all apprenticeship and on-the-job training programs and all

extracurricular activities without discrimination because of sex, sexual orientation or gender identity . . . is recognized and declared to be a civil right." Me. Rev. Stat. Ann. tit. 5, § 4601.

38. Maine Governor Janet Mills signed this amendment to the Human Rights Act into law.

39. The Maine Human Rights Act also declares: "It is unlawful educational discrimination in violation of this Act [to] on the basis of sex, sexual orientation or gender identity . . . [d]eny a person equal opportunity in athletic programs." Me. Rev. Stat. Ann. tit. 5, § 4602.

40. MDOE and the Maine Human Rights Commission have enacted a Joint Rule addressing equal educational opportunity.

41. The MDOE Joint Rule defines "unlawful educational discrimination," which means: action *on the basis of sex* to:

(1)    Exclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic extracurricular, research, occupational training or other program or activity;

(2)    *Deny a person equal opportunity in athletic programs*;

(3)    Apply any rule concerning the actual or potential family or marital status of a person or to exclude any person from any program or activity because of pregnancy or related conditions;

(4)    Deny admission to the institution or program or to fail to provide equal access to and information about an institution or program through recruitment; or

(5)    Deny financial assistance availability and opportunity.

MDOE, Joint Rule 05-071, Equal Educational Opportunity, Chapter 4.02 (emphasis added).[1]

---

[1] https://www.maine.gov/sos/cec/rules/05/071/071c004.doc [https://perma.cc/FK52-ZDKG; https://perma.cc/8E3A-KJTN].

42. The MDOE Joint Rule also prohibits discrimination in "Athletics" and, similar to Title IX, directs when athletic teams can be separated by sex.

43. The MDOE Joint Rule that prohibits discrimination in "Athletics" particularly states:

A.  **General**

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by an educational institution.

B.  **Equal Opportunity**

An educational institution which sponsors or participates in interscholastic, intercollegiate, club or intramural athletics shall provide an overall equal athletic opportunity for both sexes.

To provide equal opportunity in these programs, an institution must select sports and levels of competition which effectively accommodate the interests and abilities of both sexes and provide equal opportunities on a seasonal basis.

This section does not require all teams to be integrated or the provision of identical sports for both sexes.

In determining whether equal opportunities are available in athletics programs, the Commission shall consider whether the following are substantially equal:

*       The provision of equipment and supplies;

*       Scheduling of games and practice time;

*       Travel and per diem allowance;

*       Opportunity to receive coaching and academic tutoring;

*       Assignment of coaches, tutors and officials;

*       Provision of locker rooms, practice and competitive facilities;

*       Provision of medical and training machine facilities and services;

*       Provision of housing and dining facilities and services;

\*        Provision of supportive services and benefits, including publicity, band and cheerleading support sponsored by the educational institution.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if an educational institution operates or sponsors separate teams will not constitute per se noncompliance with this section, but the Commission may consider the failure to provide necessary funds for teams of one sex in assessing general equality of opportunity.

C.    **Single-Sex Teams**

An educational institution may sponsor single-sex team in interscholastic or inter-collegiate athletics competitions in the following instances:

(1)    The institution sponsors a team for each sex in the same sport.

(2)    The sport is boxing.

(3)    The educational institution establishes one team in a sport and, as a result of athletic competition for places on the team, or the lack of interest of students, only the members of one sex become members of the team.

In such a case, the educational institution must provide equal opportunity in athletics by sponsoring a team in another sport which effectively accommodates the interests and abilities of the opposite sex.

(4)    The educational institution establishes a single sex team in one or more sports in order to accommodate effectively the interests and abilities of one sex and to increase the general opportunities for participation by that sex.

This may be done where competition open to both sexes has or will likely result in an overall lessening of equal opportunities in athletics for one sex.

MDOE, Joint Rule 05-071, Equal Educational Opportunity, Chapter 4.11.[2]

44.  Like Title IX, MDOE's Joint Rule refers to "sex," and does not include the words "gender identity."

---

[2]  https://www.maine.gov/sos/cec/rules/05/071/071c004.doc [https://perma.cc/FK52-ZDKG].

### 2. *The Maine Principals' Association's Organizational Structure and Control Over Maine School Sports*

45.  MDOE, despite having the obligation and authority to control athletics for primary and secondary education schools in Maine, has effectively ceded that control to the Maine Principals' Association ("MPA").

46.  The MPA is a corporation located in Maine that is the governing body for youth sports in the state of Maine for primary and secondary education.  The MPA promotes, organizes, and regulates interscholastic athletics activities in the state of Maine and assumes control of "all interscholastic tournaments, meets or other forms of competition" for its members. *See* MPA Information – About Us.[3]

47.  The MPA's membership includes all public high schools and many private high schools in the state; these member schools vote on MPA issues and pay dues to the MPA.

48.  The MPA governs and controls interscholastic youth athletic programs for MPA member schools in Maine.

49.  Through its Interscholastic Management Committee, currently comprised of 12 members from Maine high schools and other liaisons, the MPA establishes, amends, and revises basic rules governing interscholastic activities, which include eligibility and competition rules.

50.  MPA member schools are bound by the rules and decisions made by the MPA for participation in "all interscholastic tournaments, meets or other forms of competition" for its members.  According to the MPA bylaws, "these rules shall be designed to ensure fair competition, equal opportunity to compete, and adequate protection of student athletes."  MPA 2023-2024 Handbook, Article I, § 1.

---

[3] https://www.mpa.cc/page/3012.

51.  The MPA administers its athletics programs by way of a constitution, bylaws, regulations, and other policy directives.  The MPA issues a Handbook with its constitution, and these bylaws, regulations, and other policy directives.  *See, e.g.*, MPA 2023-2024 Handbook.

52.  The MPA has dozens of standing committees.  Many of these standing committees correspond to particular sports, such as indoor track, outdoor track, and ski committees.

53.  Beyond particular sports, the MPA's standing committees include a Diversity, Equity, Inclusion, and Belonging Committee.

54.  The Athletic Director of North Yarmouth Academy is a current member of the MPA's Diversity, Equity, Inclusion, and Belonging Committee.

55.  MPA has the authority to penalize schools for violation of MPA bylaws and other rules and policies.

56.  For example, MPA's bylaws enact penalties for playing an ineligible student, commanding that in "any interscholastic athletic contest in which a participating school plays an ineligible student, the contest shall be declared a loss for the school using the ineligible player. In multiple interscholastic meets, any school playing an ineligible student shall be given no rating in any event in which the ineligible student participates."  MPA 2023-2024 Handbook, Article II, § 8.

### 3.  *The Maine Principals' Association's Athletics Participation Bylaw that Only Partially Separates Sports by Sex*

57.  The MPA has enacted an athletics participation bylaw, currently entitled "Gender Identity Participation Policy," that conflicts with Title IX and the Implementing Regulations and discriminates against girl student athletes.

58. The MPA's athletics participation bylaw separates some sports by sex, *i.e.*, some sports have a team designated for boys and a team designated for girls. The bylaw, however, allows boys to participate on a team designated for girls.

59. The MPA's athletics participation bylaw also prevents equal athletic opportunities for girls.

60. Since 2021, MPA's athletics participation bylaw for athletics participation has gone through multiple iterations that show the MPA modified its current bylaw intentionally to decrease the educational athletic opportunities of, and discriminate against, girls based on sex.

61. While allowing some boys who assert they are girls to compete with girls, the MPA's 2021-22 athletics participation bylaw, then entitled "Transgender Student Athlete Participation," admitted that allowing boys in girls' sports can decreases girls' educational opportunities, result in unfair athletic advantage, and risk injury.

62. The MPA 2021-22 athletics participation bylaw iteration stated in its introduction:

> The MPA is committed to maximizing the opportunities for all students to participate in interscholastic activities and athletics, regardless of their gender identity or expression. *At the same time, the MPA is committed to ensuring fair competition and adequate protection of student athletes.* Consistent with its principles, the MPA believes that all students should have the opportunity to participate in MPA activities in a manner that is consistent with their gender identity, *unless such participation would result in an unfair athletic advantage or would present an unacceptable risk of injury to other student athletes.*

MPA 2021-2022 Handbook, Article II, § 12 (emphasis added).

63. The MPA's 2021-22 athletics participation bylaw iteration also required a process for an athlete to participate in an opposite sex sport that involved documentation and approval by a MPA "Gender Identity Equity Committee," which could deny the student participation on an opposite sex sport if it found that "allowing the student to compete on a single sex team consistent with his or her gender identity would likely give the student athlete an unfair athletic

advantage or pose an unacceptable risk of physical injury to other student athletes." MPA 2021-2022 Handbook, Article II, § 12.

64. The MPA's 2022-23 athletics participation bylaw iteration, entitled "Gender Equity and Inclusion Policy," kept the 2021-2022 iteration's wording admitting that allowing boys in girls' sports can decreases girls' educational opportunities, result in unfair athletic advantage, and risk injury. MPA 2022-2023 Handbook, Article II, § 12.

65. The MPA's 2022-23 athletics participation bylaw iteration also kept the 2021-2022 iteration's wording requiring a procedure involving documentation and a MPA committee purporting to find that a particular athlete's participation in an opposite sex sport would not "likely give the student athlete an unfair athletic advantage or pose an unacceptable risk of physical injury to other student athletes." MPA 2022-2023 Handbook, Article II, § 12.

66. The MPA's 2022-23 athletics participation bylaw iteration added a provision that admitted that the MPA generally separates sports teams by "sex," rather than gender, and that single sex teams "ensure equal athletic opportunities for girls," and that boys have a "distinct athletic advantage."

67. That MPA 2022-23 athletics participation bylaw iteration stated:

BINARY (SINGLE SEX) SPORTS TEAMS. The MPA supports student athletes regardless of their gender identity or expression. The MPA also recognizes that high school sports teams have traditionally been binary (single sex) and believes that it is important to continue to offer single sex interscholastic athletic teams in order to ensure equal athletic opportunities for girls. Although there are many exceptions to the rule, most high school aged boys have a distinct athletic advantage competing against their female counterparts.

MPA 2022-2023 Handbook, Article II, § 12.

68. In the current MPA athletics participation bylaw iteration, adopted on May 6, 2024, the MPA intentionally deleted its previous admissions regarding "sex," fair competition,

ensuring equal opportunities for girls, distinct athletic advantages of boys, and risk of injury. The current iteration also deleted most of the procedural requirements for an athlete to participate in an opposite sex sport.

69.  In the current MPA athletics participation bylaw introduction, the MPA intentionally stripped previous admissions that allowing boys in girls' sports can decreases girls' educational opportunities, result in unfair athletic advantage, and risk injury.

70.  The MPA cut its current athletics participation bylaw introduction, in relevant part, down to:

> The Maine Principals' Association is committed to providing all students with an equal opportunity to participate in interscholastic athletics regardless of their sex, sexual orientation, or gender identity.

MPA 2023-2024 Handbook, Article II, § 12.

71.  In the current MPA athletics participation bylaw, the MPA also intentionally completely deleted MPA's previous admission that MPA generally separates sports teams by "sex," rather than gender identity, and that single sex teams "ensure equal athletic opportunities for girls," and that boys have a "distinct athletic advantage." *Compare* MPA 2023-2024 Handbook, Article II, § 12, *with* MPA 2022-2023 Handbook, Article II, § 12.

72.  In the current MPA athletics participation bylaw, the MPA also intentionally deleted much of the procedural approval process regarding documentation and the required MPA committee finding. The bylaw intentionally cuts the requirement that a MPA committee find that an athlete's participation in an opposite sex sport would not "likely give the student athlete an unfair athletic advantage or pose an unacceptable risk of physical injury to other student athletes."  *Compare* MPA 2023-2024 Handbook, Article II, § 12, *with* MPA 2022-2023 Handbook, Article II, § 12.

73.  As for procedural process, the MPA's current athletics participation bylaw states:

The member school shall have the sole authority to verify the student's gender identity assignment for the purposes of athletic registration and participation in MPA sponsored events.  No medical records or official documents shall be requested or required to establish a student's gender identity.

MPA 2023-2024 Handbook, Article II, § 12.

74.  The current MPA athletics participation bylaw thus gives any boy the discretion to play in girls' sports.

75.  The current MPA athletics participation bylaw states that a "student shall be eligible to participate in accordance with either their birth sex or in accordance with their gender identity, but not both."  MPA 2023-2024 Handbook, Article II, § 12.

76.  The MPA's athletics participation bylaw discriminates on the basis of sex against girls in both its language and effect.

77.  MPA member schools adhere to the MPA athletics participation bylaw and treat it as policy that they must follow for interscholastic athletic activities.

78.  For example, Maine Regional School Unit 51, which includes Greely High School, recently issued a statement through its Superintendent about recent Federal executive orders, indicating that the School Unit would follow MDOE and MPA's direction regarding athletes' participation on teams designated for a particular sex.

79.  The Maine Regional School Unit 51 Superintendent's statement on athletes' participation on teams designated for a particular sex in more detail was:

The Maine Dept. of Education sent out a memo to districts stating, "The Executive Order Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government applies to the federal government/federal government agencies only and does not inhibit the force of Maine law or locally-adopted school board policies. Maine schools are expected to abide by the Maine Human Rights Act (MHRA)." At this time, we are following state law as directed by the MDOE. In the case of athletics, the Maine Principals' Association (which oversees high school athletic rules statewide) has adopted the

Department of Education's position in following state law. There are continued legalities around how this executive order could affect federal funding to school districts, but this issue rests with the state and not local districts.

Maine Regional School Unit 51, Update from the Superintendent - February 10, 2025.[4]

80.  As another example, Maine Regional School Unit 21's policy on "Other Gender Segregated Facilities or Activities" lays out a general "gender" segregation policy but goes on to qualify that "[p]articipation in interscholastic athletic activities will be addressed in accordance with current Maine Principals Association guidelines and procedures." *See* Maine Regional School Unit 21, School Board Policy Details - Transgender and Gender Expansive Students.[5]

81.  Despite numerous warnings by federal officials, MDOE has not directed the MPA to change the athletics participation bylaw.

82.  Despite numerous warnings by federal officials, MDOE has not directed schools to urge MPA to change the athletics participation bylaw.

83.  Despite numerous warnings by federal officials, MDOE has not directed schools to cease their association with the MPA while the MPA has its athletics participation bylaw in effect.

84.  Despite numerous warnings by federal officials, MDOE has not directed schools to cease their participation in athletic activities that allow boys to compete in athletics designated for girls.

---

[4]  https://www.msad51.org/apps/news/article/2031233.
[5]  https://www.rsu21.net/school-board/rsu-21-school-board-policy/rsu-21-school-board-policy-details/~board/school-board-policy/post/acaaa-transgender-and-gender-expansive-students.

### 4. *MDOE's Responsibility for MPA's Discriminatory Athletics Participation Bylaw*

85. While the MPA established the athletics participation bylaw, MDOE bears legal responsibility for Title IX compliance in Maine schools, including in athletics.

86. MDOE has a non-delegable legal duty under Title IX to ensure compliance with federal non-discrimination requirements at all Maine educational institutions receiving federal funding, regardless of whether MDOE has delegated certain athletic governance functions to another entity.

87. The Implementing Regulations specifically provide that funding recipients must comply with Title IX "regardless of any rule or regulation of any organization, club, athletic or other league, or association" that would limit participation on the basis of sex. 34 C.F.R. § 106.6(c); accord 45 C.F.R. § 86.6. This regulation expressly precludes MDOE from evading its Title IX obligations by delegating athletic governance to the MPA.

88. As part of its receipt of federal funds, MDOE signed contractual assurances where it contractually assured the United States that all entities with which MDOE arranges to provide services or benefits are not discriminating on the basis of sex and violating Title IX and its implementing regulations.

89. MDOE retains ultimate supervisory authority over all Maine educational institutions, including their athletic programs. *See generally* Me. Rev. Stat. Ann. tit. 20-A.

90. MDOE knowingly permits, and effectively encourages, Maine schools to participate in and follow MPA policies that violate Title IX, despite having statutory and contractual obligations to direct schools not to follow discriminatory policies. *See* Me. Rev. Stat. Ann. tit. 20-A, § 254.

91.  MDOE actively facilitates the implementation of MPA's discriminatory policy by, among other things:  (a) providing state and federal funding to schools that follow MPA's discriminatory bylaw; (b) permitting the use of school facilities, resources, and personnel for athletic events conducted under MPA's discriminatory bylaw; and (c) publicly endorsing and defending MPA's policy as consistent with Maine state law.

92.  MDOE has repeatedly been notified by federal authorities that the current MPA athletics participation bylaw violates Title IX, yet MDOE has taken no action to require MPA to modify its policy or to direct Maine schools not to follow the discriminatory aspects of MPA's policy.

93.  MDOE's deliberate inaction in the face of known Title IX violations constitutes discrimination against female athletes based on sex, in violation of Title IX and its implementing regulations.

### 5.  *MDOE's Failure to Stop the Maine Principals' Association's Athletics Participation Bylaw Denies Equal Benefits and Opportunities to Girl Athletes*

94.  MDOE has the authority and obligation to stop schools from following the MPA's athletics participation bylaw, and its failure to do so denies girl athletes equal educational benefits and opportunities based on their sex.

95.  The MPA's athletics participation bylaw causes disparities of a substantial and unjustified nature in the benefits, treatment, services, and opportunities afforded to female athletes.

96.  Because of males' biological athletic advantage, which is not affected by how the male "identifies," the MPA's athletics participation bylaw has no meaningful impact on the benefits, treatment, services, and opportunities afforded to male athletes.

97.  According to a MPA Memorandum to the Maine Committee on Judiciary, from 2013 to 2021, when the athletics participation bylaw still required the MPA to approve individual athletes' participation on teams other than those of their sex, the MPA Gender Equity and Inclusion Committee held hearings for 56 such students wishing to participate in high school athletics.[6]

98.  In 2023, approximately 2,374 Maine high schoolers, or approximately 4.5%, identified as something other than their sex, according to the Maine Integrated Youth Health Survey.

99.  Boy athletes are currently competing against girls in sports designated for girls in Maine.

100.  For example, Student A is a boy currently and recently competing as on the girls' track and field team for Greely High School, in Cumberland, Maine.

101.  Greely High School is part of Maine Regional School Unit 51, which as explained above recently confirmed it would continue to adhere to the MPA's athletics participation bylaw. *See supra* ¶¶ 78-79.

102.  On approximately February 17, 2025, Student A competed in the girls' competition and won first place with a pole vault of 10 feet, 6 inches at the Maine Indoor Track & Field Meet, Class B state meet for Greely High School.

103.  Student A's victory surpassed all girl competitors, including two from Freeport High School, who both cleared 10 feet to tie for second.  In addition, Greely High School won both the boys' and girls' team state indoor titles.

---

[6] *See* https://legislature.maine.gov/legis/bills/getTestimonyDoc.asp?id=178976.

104. Greely High School beat Freeport High School in the girls' division by one point, and in turn the overall girls' team title by just one point. Greely's one-point victory over Freeport in the girls' division was impacted by Student A's pole vault win.

105. Student A's victory qualified Student A for the multistate regional championships, which displaced a girl athlete who would have taken the spot had Student A competed in the boys' division.

106. If Student A had competed in the boys' division, Student A's 10 feet, 6 inch jump would have tied for 10th out of 13 boy participants.

107. Student A previously competed in boys' athletics under a different name for Greely High School. On approximately February 19, 2024, Student A participated in the Maine Class B state meet against other boys and tied for ninth place.

108. Student A currently intends to keep competing on the girls' track and field team for Greely High School.

109. Student A's participation in sports designated for girls has displaced and will continue to displace girls and harm girls' equal educational athletic opportunities.

110. As another example, Student B is a boy currently and recently competing in girls' skiing for MPA member Maine Coast Waldorf School, which includes a high school and is located in Freeport, Maine.

111. On approximately February 18-19, 2025, Student B competed in the girls' High School State Nordic Skiing Championships at Maine's Black Mountain.

112. Student B took third place in girls' Class C Freestyle and Pursuit races and took fourth place in girls' Class C Classical ski competitions. Student B's placements in these events

facilitated Student B's school, Maine Coast Waldorf School, to win third place overall at the girls' state meet.

113.  Student B is also currently and recently competing in girls' cross country running for Maine Coast Waldorf School, and in girls' outdoor track for MPA member North Yarmouth Academy (because Maine Coast Waldorf School does not field an outdoor track team).

114.  In October 2024, Student B placed first in the girls' five-kilometer cross-country run at the Western Maine Conference Championship.  If Student B had participated in the boys' five-kilometer cross-country run at the competition, Student B's time would have dropped Student B to 43rd place.

115.  In September 2023, Student B placed fifth in the girls' category at the Maine XC Festival of Champions in Belfast.  At this same competition in 2022, Student B competed in the boys' category and placed 206th.

116.  When competing in boy competitions as a freshman in 2022, Student B was ranked as 172nd in cross country running; when competing in girl competitions as a sophomore in 2023, Student B was ranked at least as high as 4th; when competing in girl competitions as a junior in 2024, Student B was ranked as high as 2nd.

117.  In 2022, Student B placed 213th in the Class C boys' cross country state tournament.  In 2023 and 2024, however, Student B placed 3rd in the girls' cross country state tournament both years, displacing a girl from the podium in each year.

118.   Student B is also currently and recently competing in girls' track and field for North Yarmouth Academy.

119.  In 2023, Student B competed in the boys' 1600 meters for North Yarmouth Academy.  In that event, Student B placed 12th in the boys' Maine Class C state tournament.

120.  In 2024, Student B competed in three girls' track and field events, namely the girls' 800, 1600, and 3200 meters for North Yarmouth Academy.  In June 2024, Student B won the girls' 800 meters and finished third in the girls' 1600 and 3200 meters in the Maine Class C state tournament.

121.  Student B currently intends to keep competing in Maine high school girls' skiing, cross country running, and track and field.

122.  Student B's participation in sports designated for girls has displaced and will continue to displace girls and harm girls' equal educational athletic opportunities.

123.  As another example, Student C is boy recently competing on the Portland High School girls' basketball team.

124.  Student C's participation in sports designated for girls has displaced girls and harmed girls' equal educational athletic opportunities.

125.  Beyond Students A, B, and C, other boy athletes have competed in, and will continue to compete in, athletic sports and competitions designated for girls, and have displaced, and will continue to displace, girls and harm their equal educational athletic opportunities due to the discriminatory polices MDOE has facilitated and failed to stop.

126.  Girl athletes and their families have an interest, and have expressed this interest to schools and MDOE, in female-only sports teams and competitions that effectively accommodate their interests and abilities.

127.  Girl athletes and their families have an interest, and have expressed this interest to schools and MDOE, in revoking or ending enforcement of the MPA's bylaw that decreases the quality of their competitive opportunities.

128.  The MDOE's facilitation of and failure to stop the MPA's athletics participation bylaw denies girls the equal athletic opportunity to qualify for, to compete and advance in, and to win or place higher in post season competitions.

129.  Because of males' biological athletic advantage, MDOE's facilitation of and failure to stop the MPA's athletics participation bylaw make it impossible for girls' educational athletic interests and abilities to be fully and effectively accommodated.

130.  The MDOE's facilitation of and failure to stop the MPA's athletics participation bylaw deny girls the equal athletic benefit of public visibility and recognition of athletic competition accomplishment, and increased opportunity for college athletic recruiting and scholarships.

131.  The MDOE's facilitation of and failure to stop the MPA's athletics participation bylaw cause girls to have materially fewer athletic opportunities than they previously enjoyed because they no longer can compete in fair, exclusively girl competition.

### C. DEFENDANT MDOE RECEIVES FEDERAL FUNDING

132.  Title IX applies to education programs and activities receiving financial assistance from the federal government, including from USDOE and HHS.

133.  MDOE receives federal financial assistance from USDOE and HHS and other federal departments and agencies.

134.  As part of receiving federal financial assistance, MDOE signed contractual assurances that it would comply with Title IX and the implementing regulations.

135.  In the current fiscal year, Maine is distributing millions in federal funds to school districts.

### D.    Title IX Investigations and Findings by USDOE and HHS

136.  After Executive Orders 14168 and 14201, which confirmed Title IX's term "sex" means biological sex, MPA's executive director stated that the Executive Orders and Maine's Human Rights Act are in conflict and that the MPA would continue to follow the state's law when it comes to gender identity.

137.  On February 21, 2025, in response to Executive Orders 14168 and 14201, Maine Governor Mills stated that Maine was going to continue to allow boys to compete in girls' sports and that the federal executive branch would need to file a lawsuit to attempt to secure compliance with Title IX, and at one point stating:  "We'll see you in court."

138.  On February 21, 2025, USDOE, through its Office of Civil Rights, and HHS, through its Office of Civil Rights, both notified MDOE of their initiation of Title IX compliance review investigations, based on public statements by Maine Governor Mills and MDOE leadership, as well as other public reports, indicating that MDOE was violating Title IX in student athletics.

139.  On February 25, 2025, United States Attorney General Pamela Bondi sent Maine Governor Mills a letter reiterating that Title IX prohibits requiring girls to compete against boys in sports and athletic events and that Title IX trumps any state law that conflicts with Title IX, and also urging Maine to voluntarily comply with Title IX.[7]

#### 1.    HHS Findings and Attempts to Secure Voluntary Compliance

140.  On February 25, 2025, HHS sent MDOE a Notice of Violation, finding MDOE in violation of Title IX, and warning of a potential referral to the United States Department of Justice for potential remedial enforcement.

---

[7] *See* https://www.justice.gov/ag/media/1390796/dl.

141.  On February 27, 2025, HHS sent MDOE a proposed Voluntary Resolution Agreement that outlined the actions that MDOE needed to take to come into voluntary compliance with Title IX.

142.  On March 12, 2025, HHS met with MDOE, and MDOE would not sign or provide a counteroffer to the proposed Voluntary Resolution Agreement.

143.  On March 17, 2025, HHS sent MDOE an Amended Notice of Violation and a revised, proposed Voluntary Resolution Agreement; this notice also warned of a potential referral to the United States Department of Justice for potential enforcement.

144.  MDOE failed to respond substantively to HHS's Amended Notice of Violation and the revised, proposed Voluntary Resolution Agreement.

145. HHS made concerted efforts to bring Defendant into compliance with Title IX. HHS subsequently determined that Defendant's compliance could not be achieved by voluntary means.

146.  On March 28, 2025, HHS referred its findings of Defendant's Title IX violations to the United States Department of Justice for enforcement and notified Defendant of the referral.

### 2.  *USDOE Findings and Attempts to Secure Voluntary Compliance*

147.  On March 19, 2025, USDOE sent MDOE a notice of Finding of Noncompliance with Title IX and a Proposed Resolution Agreement.

148.  After that March 19, 2024, notice, USDOE attempted to discuss a voluntary resolution with MDOE, and MDOE refused to engage in substantive discussions.

149.  On March 31, 2025, USDOE sent MDOE a letter finding that voluntary compliance attempts were at an impasse, and warning that if a voluntary agreement was not reached by April 11, 2025, the USDOE would refer the notice of violation to the United States Department of Justice for enforcement.

150.  On April 11, 2025, MDOE affirmatively responded that it would not enter into a voluntary compliance agreement and that attempts to secure compliance were at an impasse.

151.  USDOE made concerted efforts to bring Defendant into compliance with Title IX. USDOE subsequently determined that Defendant's compliance could not be achieved by voluntary means.

152.  On April 11, 2025, after MDOE affirmed impasse, USDOE referred its findings of Defendant's Title IX violations to the United States Department of Justice for enforcement, and notified Defendant of the referral.

153.  All prerequisites to filing this lawsuit have been satisfied.

## CLAIMS

### COUNT I
### VIOLATION OF TITLE IX

154.  The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs numbered 1-153.

155.  Defendant MDOE received, and continues to receive, federal financial assistance for its educational programs and activities.

156.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.

157.  Based on all the foregoing, Defendant has violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* and its implementing regulations.

158.  Defendant's Title IX violations harm, and continue to harm, student athletes.

159.  Unless restrained by this Court, Defendant will continue to violate Title IX.

## COUNT II
## VIOLATION OF TITLE IX CONTRACTUAL ASSURANCES

160.  The United States realleges and incorporates by reference the allegations set forth in all the above paragraphs numbered 1-157.

161.  Defendant has expressly agreed to comply with Title IX and its implementing regulations, and to ensure all parties with whom it arranges to provide services or benefits also comply, as a condition of receiving federal financial assistance by signing contractual assurance agreements with the United States.

162.  Defendant's Title IX violations are material breaches of its contractual assurance agreements.

163.  The United States has suffered damages from Defendant's breach of its contractual assurance agreements.

164.  Unless restrained by this Court, Defendant will continue to materially breach its contractual assurance agreements with the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court grant the following relief:

(a)  A declaratory judgment that Defendant's policies, practices, and actions violate Title IX and Defendant's Title IX contractual assurances;

(b)  A permanent injunction prohibiting Defendant, and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendant, from further violating Title IX and Defendant's Title IX contractual assurances;

(c) A permanent injunction ordering Defendant to:

    (1) Issue directives to all Maine schools prohibiting the participation of males in athletic competitions designated for females;

    (2) Require schools to cease their association with the MPA unless and until the MPA amends its bylaws to prohibit males from participating in athletic competitions designated for females;

    (3) Implement a monitoring and enforcement system to ensure compliance with Title IX's requirement of equal athletic opportunity;

    (4) Establish a process to compensate female athletes who have been denied equal athletic opportunities due to Defendant's violations, including correcting past athletics records; and

    (5) Submit regular compliance reports to the Court and the United States for a period of no less than five years;

(d) A damages award to the United States;

(e) An award of any applicable costs and fees; and

(f) An award of all such other additional relief as the interests of justice may require.

## JURY DEMAND

The United States requests trial by jury on all eligible claims.

DATED:  April 16, 2025

                                        PAMELA BONDI
                                        Attorney General

                                        TODD BLANCHE
                                        Deputy Attorney General

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK S. KAMBLI
Deputy Associate Attorney General

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division


 */s/ Matthew J. Donnelly*
MATTHEW J. DONNELLY
Attorney
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone: (202) 616-2788
Email: matthew.donnelly@usdoj.gov