**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-00173-SDN |
| | ) | |
| MAINE DEPARTMENT OF EDUCATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THE MAINE DEPARTMENT OF EDUCATION'S MOTION**
**FOR JUDGMENT ON THE PLEADINGS**

Pursuant to Federal Rule of Civil Procedure 12(c), Defendant Maine Department of Education ("Maine DOE") moves for judgment on the pleadings. Plaintiff United States' claims fail for multiple reasons.

First, Plaintiff's claims are barred by the Spending Clause of the U.S. Constitution because the Maine DOE did not have "clear notice" that Title IX unambiguously requires, as a condition of the receipt of federal funds, the exclusion of transgender girls from girls' sports. Just last month, Justice Gorsuch wrote that "[n]othing in Title IX clearly and unambiguously alerts funding recipients that they are prohibited from restricting a school-sponsored sports team to biological women or girls." *West Virginia v. B.P.J.*, 609 U.S. ---, --- S.Ct. ----, 2026 WL 1868739, *18 (Gorsuch, J. concurring) (hereafter "*B.P.J.*"). The same is true with respect to *allowing* transgender girls to participate on girls' teams. *See Female Athletes United v. Ellison*, 172 F.4th 1019, 1029 (8th Cir. 2026) ("[T]here can be no dispute that whether Title IX . . . permits . . . the participation of transgender athletes in female athletics remains an open question of law."). If it were clear that there was only one answer under Title IX, there would be no

reason for the U.S. Supreme Court to have stated in *B.P.J.* that "nothing in [its] opinion is intended to decide" whether "schools may *allow* [transgender girls and women] to participate on girls' and women's sports teams." 2026 WL 1868739, at \*4 n.1 (emphasis in original). Without clear notice that Title IX required the exclusion of transgender girls in girls' sports at the time Maine DOE received federal funds, the Spending Clause bars Plaintiff's claims.

Second, neither Title IX nor its implementing regulations require either the complete separation of sports teams by birth sex, or the exclusion of transgender girls from girls' sports. Nor does the Complaint allege facts sufficient to establish a Title IX claim. Plaintiff has, therefore, failed to allege a Title IX claim.

This failure similarly dooms Plaintiff's claim for breach of Title IX "contractual assurances." The assurances promise nothing more than compliance with Title IX, and Maine DOE has complied with Title IX. Plaintiff also makes the extraordinary claim that it is entitled to damages, seeking to transform a mechanism for ensuring compliance into a vehicle for politically motivated punishment. Such damages are not authorized by Title IX.

## FACTUAL AND LEGAL BACKGROUND

### *Title IX*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). While the statute itself does not address school athletic programs, *see generally* 20 U.S.C. §§ 1681-1688, the U.S. Department of Education (USDOE) and the U.S. Department of Health and Human Services (USHHS) have promulgated implementing regulations that address school

athletics.[1] 34 C.F.R. § 106.41. Congress directed the promulgation of these regulations through the Javits Amendment, which required their predecessor agency to address the application of Title IX's sex-discrimination prohibition "with respect to intercollegiate athletic activities," while accounting for "the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974).

The athletics regulations establish a general rule prohibiting sex-separated athletics. *Id.* § 106.41(a). However, "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," the regulations permit – but do not require – separate sex teams. *Id.* § 106.41(b). Whether a recipient maintains sex separate teams or not, the regulations require "equal athletic opportunity for members of both sexes," such that "both sexes" are effectively accommodated in "the selection of sports and levels of competition," and enjoy equal treatment in the provision of schedules, equipment, coaching, and other factors. *Id.* § 106.41(c). The regulations, like Title IX itself, do not define "sex." *See id.* § 106.2 (establishing definitions); 34 C.F.R. pt. 106.

### *The Maine Human Rights Act*

The Maine Human Rights Act ("MHRA") broadly prohibits discrimination against various protected classes in various areas. 5 M.R.S. §§ 4551-4634. It protects against discrimination on the basis of gender identity in employment, housing, education, credit, and public facilities. *Id.* In 2014, Maine's Law Court ruled that failing to allow a transgender girl to access the girls' restroom in her elementary school violated the MHRA's prohibition on discrimination based on sexual orientation, which the statute defined at the time to include gender identity. *Doe v. Regional Sch. Unit 26*, 2014 ME 11; 86 A.3d 600 (2014); *see* 5 M.R.S.

---

[1] The regulations are "substantially the same." Compl. ¶ 20; *compare* 34 C.F.R. §§ 106.1-106.82, *with* 45 C.F.R. §§ 86.1-86.71. For ease of reading, this memorandum will cite only the USDOE regulations.

3

§ 4553(9-C) (2013). The MHRA was subsequently amended in 2019 and 2021 to explicitly include "gender identity." *See* Me. Pub. L. ch. 464 (2019), § 1 (separately defining "gender identity" and "sexual orientation," codified at 5 M.R.S. § 4553(5-C), (9-C)); Me. Pub. L. ch. 366 (2021) (amending the MHRA's policy statement, 5 M.R.S. § 4552, to expressly identify gender identity as a protected basis). The MHRA specifically prohibits schools from "[d]eny[ing] a person equal opportunity in athletic programs" based on, among other things, gender identity. 5 M.R.S. § 4602(1). The Maine Human Rights Commission ("MHRC") and the Maine DOE have a joint rule that is similar in substance to the Title IX regulations. *See* Maine DOE, Joint Rule 05-071, Equal Educational Opportunity, Ch. 4. To date, the rule has not been updated to specifically include gender identity. *See id.*

The MHRC, which implements and enforces the MHRA, also has guidance regarding the education provisions of the MHRA. *See* Memo dated Jan. 13, 2016 from MHRC Counsel.[2] It states: "Whenever educational or extra-curricular opportunities offered by a covered educational institution are offered separately to students based on sex and/or gender, students shall be allowed to participate in accordance with their gender identity." *Id.* It further states: "Students should be allowed to compete on single-sex/gender teams based upon their gender identity." *Id.*[3] Finally, the Maine Principals' Association, the governing body for interscholastic athletics in Maine, has revised its bylaws over time to comply with the MHRA. *See* Compl. ¶¶ 46, 61-75.

---

[2] *See* Maine Human Rights Commission, Memo on Interpretation of the Education Provisions of the MHRA (Jan. 13, 2016), *available at* https://www.maine.gov/mhrc/sites/maine.gov.mhrc/files/inline-files/CCmemo.education.so_.pdf.

[3] The MHRC's guidance also provides that if the participation of a transgender student on "the single-sex/gender team that most closely matches the student's gender identity poses a significant risk of substantial physical harm to the student or to other participants," the educational institution and the student "shall enter into interactive discussions to minimize or eliminate the threat of substantial harm, while also providing mutually acceptable athletic opportunity for the student." *Id.*

For more than a decade, Maine has provided transgender students access to school sports consistent with their gender identity. Because the MHRA's nondiscrimination protections allow every student – transgender and non-transgender girls and boys alike – to participate in accordance with their gender identity, they apply evenhandedly, rather than singling out any group for special treatment. Until recently, transgender students have competed openly and publicly without incident. Maine has provided assurances to the federal government that it is complying with Title IX, and until 2025, neither USDOE nor USHHS had taken any action to suggest that the MHRA, as interpreted by the MHRC, is inconsistent with Title IX.

### President Trump's Executive Orders

On January 20, 2025, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Ideology EO"). 90 Fed. Reg. 8615 (Jan. 30, 2025). It declares: "It is the policy of the United States to recognize two sexes, male and female." *Id.* § 2. "These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* It further states: "'Sex' shall refer to an individual's immutable biological classification as either male or female." *Id*. § 2(a). "'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.* The Gender Ideology EO defines "[w]omen" and "girls" as "adult and juvenile human females, respectively," and "[m]en" and "boys" as "adult and juvenile human males, respectively." *Id*. § 2(b), (c). "Female" is defined as "a person belonging, at conception, to the sex that produces the large reproductive cell." *Id.* § 2(d). "Male" is defined as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id*. § 2(e).

On February 5, 2025, President Trump issued Executive Order 14201, titled "Keeping Men Out of Women's Sports" (the "Sports EO"). 90 Fed. Reg. 9279 (Feb. 11, 2025). The Sports

5

EO incorporates the definitions in the Gender Ideology EO. *Id*. § 2. It states: "In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports." *Id*. § 1. It announces that "it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." *Id*. It directs the Secretary of Education to "prioritize Title IX enforcement actions against educational institutions . . . that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against or to appear unclothed before males." *Id.* § 3(a)(iii). It also orders executive agencies to "review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order." *Id.*§ 3(b).

### *The "Investigations" and Subsequent Lawsuit*

On February 21, 2025, the same day as a widely publicized exchange at the White House, in which Maine Governor Janet Mills stated that Maine was in compliance with state and federal law and President Trump threatened to withhold federal funding to Maine, both USHHS and USDOE opened investigations into the Maine DOE's compliance with Title IX. *See* Compl. §§ 137-38. USHHS opened its investigation despite the fact that the Title IX assurance of compliance form then in effect – and which USHHS only proposed changing earlier this year – included both "sexual orientation" and "gender identity" as protected characteristics.

After "investigations" that lasted 4 days (USHHS) and 26 days (USDOE) and included no attempts to obtain information from the Maine DOE, the federal agencies advised the Maine DOE that it was noncompliant. *See* Compl. §§ 138, 140, 147. After attempting to force Maine to

sign Voluntary Resolution Agreements that, *inter alia*, would have required Maine to admit that the MHRA violates Title IX and apologize to female athletes, the federal agencies referred the matters to the U.S. Department of Justice (DOJ). *See* Compl. ¶¶ 140-153.

On April 16, 2025, the United States sued the Maine DOE. Count I of the Complaint alleges a violation of Title IX. Count II alleges a violation of Maine DOE's "contractual assurances" to comply with Title IX. According to the Complaint, Maine's "policies and actions" that allow transgender girls to participate in interscholastic athletics consistent with their gender identity "discriminate on the basis of sex" and "den[y] girl athletes equal educational benefits and opportunities." Compl. ¶¶ 2, 7, 94.

To support the alleged Title IX violation, the Complaint includes three "examples" of transgender girls who competed in girls' interscholastic athletic events, each for different schools in different sports. Compl. ¶¶ 100-124. According to the Complaint, one competed in girls' track and field, and won first place in the pole vault at a meet. *Id.* ¶¶ 100-109. A second participated in girls' Nordic skiing, cross-country running, and outdoor track, and placed, at various times, first, third, fourth, and fifth in competitions. *Id*. ¶¶ 110-22. A third played on a girls' basketball team. *Id.* ¶¶ 123-124. Absent from the Complaint are any facts alleging that, in any school program or in the State of Maine, non-transgender girls are unable to participate on sports teams or compete in their chosen sports, that they were denied effective accommodation in the available selection of sports or levels of competition, or that they experienced unequal treatment in interscholastic sports within the meaning of Title IX's regulations. As explained further below, the Complaint's allegations that individual transgender athletes have displaced non-transgender girls do not satisfy the standards Title IX actually imposes. *See* infra Section II.B.1.

## LEGAL STANDARD

A party may move for judgment on the pleadings after the pleadings are closed but within such time as not to delay the trial. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a motion to dismiss. *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54 (1st Cir. 2006). The Court must view the facts in the pleadings in the light most flattering to the nonmovants and draw all reasonable inferences in their favor. *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988). The First Circuit has recognized a "modest difference" between Rule 12(c) motions and Rule 12(b)(6) motions. A Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole. *Aponte-Torres*, 445 F.3d at 54-55 (1st Cir. 2006). The Court may also consider other documents, including official public records, documents central to plaintiff's claim, documents sufficiently referred to in the complaint, and documents the authenticity of which are not disputed by the partes. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

## ARGUMENT

Maine DOE is entitled to judgment on the pleadings on each of Plaintiff's claims for multiple, independent reasons.

## I.    Plaintiff's Claims are Barred by the Spending Clause.

Plaintiff's claims are barred by the Spending Clause of the U.S. Constitution, because the Maine DOE did not have "clear notice" that Title IX unambiguously requires, as a condition of federal funding, the exclusion of transgender girls from girls' sports and facilities. "Title IX was enacted as an exercise of Congress' powers under the Spending Clause." *B.P.J.*, 2026 WL 1868739, at *18 (Gorsuch, J. concurring) (*quoting Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 181 (2005)). Under the "contract-law analogy" of Spending Clause legislation, *Barnes v.*

8

*Gorman*, 536 U.S. 181, 186 (2002), conditions on federal funding must be imposed "voluntarily and knowingly" and therefore "unambiguously." *Pennhurst State Sch. & Hosp.* v. *Halderman,* 451 U.S. 1, 17 (1981). Recipients must have "clear notice" of a funding condition prior to accepting funds. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Courts accordingly "construe the reach of Spending Clause conditions with an eye toward ensuring that the receiving entity of federal funds had notice that it will be liable." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (internal quotations and alternations omitted). The clear notice requirement applies to funding conditions imposed by agencies, as well as those set by Congress. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1174-75 & n.6 (9th Cir. 2019).

The Maine DOE did not have clear notice that Title IX unambiguously requires the exclusion of transgender girls from girls' athletics. Neither Title IX nor its implementing regulations, including 34 C.F.R. § 106.41, indicate that the MHRA's requirements violate Title IX. *See generally* 20 U.S.C. §§ 1681-1688; 34 C.F.R. pt. 106. Nor do they require that recipients separate athletics teams based on sex or prohibit states from allowing transgender students to participate in athletics and access athletics facilities consistent with their gender identity.

Moreover, the Title IX regulations in effect in Maine in 2024 and 2025 expressly listed gender-identity discrimination as a form of sex discrimination – a provision that is likely incompatible with the exclusionary funding condition Plaintiff now seeks to impose. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474-01, 33886-01 (Apr. 29, 2024) (vacated by *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025)). After *Cardona* vacated the 2024 rule, the operative regulations reverted to the 2020 Title IX regulations, which – as discussed further

9

below – likewise gave the Maine DOE no notice that inclusive policies were incompatible with Title IX. Thus, in neither 2024 nor 2025 did the regulations provide clear notice that inclusive policies violated Title IX. And the Title IX assurances required by the USHHS – and which the USHHS only proposed changing earlier this year – included both "sexual orientation" and "gender identity." 91 Fed. Reg. 3205, 22158-01 (Jan. 26 & April 24, 2026).

Against this backdrop, the MHRA, as interpreted by Maine's highest court in *Doe v. Regional School Unit 26*, 2014 ME 11; 86 A.3d 600 (2014), and as subsequently amended in 2019 and 2021 to explicitly include "gender identity," has permitted transgender youth to access their education, including participation in athletics, in accordance with their gender identity for over a decade. It was not until February 2025, that the federal government alleged that the MHRA, or the policies of the MPA designed to align with the MHRA, violate Title IX.

This enforcement position represents a reversal of the federal government's prior interpretation of Title IX. The historical record reflects a consistent federal posture of deference to States or affirmative protection for transgender students. In May 2016, USDOE and DOJ jointly advised that Title IX's prohibition on sex discrimination "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status," and directed schools to treat students consistent with their gender identity in athletics and facilities.[4]  In February 2017, the two agencies withdrew that guidance and expressly deferred to states – explaining that "there must be due regard for the primary role of the States and local school districts in establishing educational policy" – but they did not require recipients to exclude transgender girls from girls' facilities or athletic teams.[5]  The preamble to USDOE's

---

[4] U.S. Dep't of Educ., Office for Civil Rights & U.S. Dep't of Just., Civil Rights Division, Dear Colleague Letter on Transgender Students (May 13, 2016), *available at* https://www.justice.gov/opa/file/850986/dl.
[5] U.S. Dep't of Educ., Office for Civil Rights & U.S. Dep't of Just., Civil Rights Division, Dear Colleague Letter (Feb. 22, 2017), *available at* https://www.ed.gov/media/document/colleague-2017-title-ix-35085.pdf.

2020 Title IX regulations, promulgated during the first Trump Administration, stated that the regulations "will help protect against sex discrimination regardless of a person's race or ethnicity, age, sexual orientation, or gender identity," 85 Fed. Reg. 30026, 30064 (May 19, 2020), and that USDOE "will not tolerate sexual harassment . . . against any student, including LGBTQ students," *id.* at 30179, though those regulations, like Title IX itself, did not specifically address transgender students' access to sex-separated athletics. As recently as 2023, the federal government took the position that categorically excluding transgender girls from girls' sports violated Title IX, *see* Brief for the United States as Amicus Curiae Supporting Appellant, *B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078(L), 23-1130 (4th Cir. Apr. 3, 2023), a position the Fourth Circuit – at the time, the only circuit to have addressed the question – adopted, *see B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *rev'd sub nom. West Virginia v. B.P.J.*, 609 U.S. ----, 2026 WL 1868739 (2026). Given this decade of shifting and, until 2025, consistently protective federal guidance, the Maine DOE could not have had clear notice that accepting federal funds required it to abandon the MHRA's inclusive policies.

To this day, states remain deeply divided as to whether transgender athletes are allowed to compete in accordance with their gender identity. While *B.P.J.* resolves one piece of the debate – holding that Title IX permits states to exclude transgender girls from participating in girls' sports based on their birth sex, *see* 2026 WL 1868739, at *7-9 – the question of whether a state may allow such participation without violating Title IX is unresolved, *see Female Athletes United*, 172 F.4th at 1029 (acknowledging that this is an "open question of law"). The Supreme Court in *B.P.J.* emphasized that courts should be "cautious about swooping in and invalidating laws" in this area of "medical and scientific uncertainty," because legislatures "maintain 'wide discretion to pass legislation'" on such matters. 2026 WL 1868739, at *15 (quoting *United States*

11

*v. Skrmetti*, 605 U.S. 495, 524 (2025)). As the Court explained in both *B.P.J.* and *Skrmetti*, it would ultimately "leave questions regarding . . . policy to the people, their elected representatives, and the democratic process." *Id.* (quoting *Skrmetti*, 605 U.S. at 525). Maine's choice to permit transgender girls to participate in girls' athletics is precisely the kind of policy judgment the Court left to the states.

Because Maine DOE did not have clear notice that Title IX unambiguously requires the exclusion of transgender girls from girls' sports, it lacked adequate notice that it could be held liable under either Title IX or its assurance that it would comply with Title IX. *Los Angeles*, 929 F.3d at 1174-75 & n.6. The Spending Clause, therefore, bars each of Plaintiff's claims and the Court must enter judgment on the pleadings.

## II.    Plaintiff Fails to State a Cognizable Title IX Claim.

Because Plaintiff's claims are clearly barred by the Spending Clause, the Court need not grapple with the question of what Title IX actually requires. *See Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S. ---, 146 S.Ct. 1931, 1939 & n.1 (2026) (resolving a Spending Clause challenge and declining to reach statutory arguments). However, if the Court does reach this question, judgment should be entered for Maine DOE as to Count I.

Title IX and its regulations do not expressly prohibit transgender girls from participating in girls' athletic competitions, and Plaintiff cannot rely on either of the Executive Orders to read the current administration's interpretation into the law. Moreover, Plaintiff has not, and cannot, plead facts that would support a violation of Title IX's requirement that girls have an equal opportunity to participate in interscholastic sports.

A. <u>Neither Title IX Nor Its Regulations Require the Exclusion of Transgender Girls from Girls Sports</u>.

Plaintiff alleges that the inclusion of transgender girls in girls' sports violates Title IX by discriminating against non-transgender girls on the basis of sex. Compl. ¶ 2. While *B.P.J.* holds that Title IX permits schools to limit girls' sports teams based on birth sex, nothing in Title IX, or in *B.P.J.*, prevents Maine from enacting inclusive policies. *See* 2026 WL 1868739, at *4. Indeed, the Supreme Court in *B.P.J.* expressly reserved the "distinct question" of whether Title IX permits schools to allow transgender girls to participate in girls' sports, stating that "[n]othing in this opinion is intended to decide that question." *Id.* at *4 n.1. Prior to *B.P.J.*, courts that have held that Title IX allows schools to separate athletics based on birth sex have also recognized that Title IX does not require such policies and that schools "could also separate programs and facilities by gender identity." *Tennessee v. Dep't of Educ.,* 104 F.4th 577, 610-11 (6th Cir. 2024). Providing Maine the latitude to adopt inclusive policies and laws is consistent with the overarching purpose of Title IX, which is "equal athletic opportunity" for girls and boys. *See* 34 C.F.R. § 106.41(c). As described below, the Complaint fails to allege facts demonstrating that allowing transgender girls to participate on girls' sports teams has displaced athletic opportunities for non-transgender girls using the analysis adopted by the First Circuit. Title IX does not require sex-separated teams to accomplish the goal of equal athletic opportunity, let alone require teams separated by birth sex.

The Complaint also relies on the two Executive Orders, describing them as "consistent with 'sex' meaning biological sex in Title IX." Compl. ¶ 23. It is not clear whether Plaintiff asserts that the Executive Orders govern the interpretation of Title IX or create a basis for Title IX enforcement. *See id.* Either assertion would be incorrect. An Executive Order cannot amend a federal statute. *See, e.g.*, *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th

13

Cir. 2018) ("[T]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.") (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)). Reliance on the Executive Orders to enforce Title IX would violate the Administrative Procedure Act ("APA") for at least two reasons: (1) neither USDOE nor USHHS went through notice-and-comment rulemaking to amend Title IX's regulations to include the policy and definitions of the Gender Ideology EO, and (2) neither agency has provided a reasoned explanation for adopting the Gender Ideology EO, including its definition of sex. *See* 5 U.S.C. §§ 553(b), 706(2)(A), (D).

  B.  <u>Plaintiff Fails to Plead Facts That Establish a Valid Title IX Claim</u>.

Plaintiff claims that allowing transgender girls to participate in girls' sports inherently and facially denies equal athletic benefits and opportunities to non-transgender girls. Compl. ¶¶ 4-5. But Plaintiff identifies no statutory text, regulation, or established line of Title IX precedent recognizing such a categorical rule. To the contrary, this principle appears nowhere in the traditional framework for evaluating whether schools provide equal athletic opportunities under Title IX. In determining whether equal opportunities are available to both sexes, Title IX's regulations set forth standards for "effective accommodation" and "equal treatment." *See Mansourian v. Regents of the Univ. of Cal.,* 602 F.3d 957, 964-65 (9th Cir. 2010). Effective accommodation claims turn on whether a funding recipient's "selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id.* at 964 (*quoting* 34 C.F.R. § 106.41(c)(1)). Equal treatment claims involve whether there are "sex-based differences" in a recipient's provision of benefits like equipment, scheduling, coaching, and other factors. *Id.* at 964-65 (*citing* 34 C.F.R. § 106.41(c)(2)-(10)). In addition to these standards, USDOE may also make a finding of overall compliance (or lack thereof) with Title IX. *See* 1979 Policy Interpretation, 44 Fed. Reg. 71413, 71417-18 (Dec. 11, 1979). In this case,

Plaintiff does not plausibly allege any violation of effective accommodation, equal treatment, or overall compliance, much less a facial violation of Title IX.

### 1.  *Plaintiff Fails to State an Effective Accommodation Claim.*

An "effective accommodation" claim asks whether a school's selection of sports and levels of competition gives members of each sex an equal opportunity to participate based on their relative interests and abilities. Plaintiff alleges that the Maine DOE has failed to "effectively accommodate[]" non-transgender girls' athletic interests. Compl. ¶¶ 126, 129. However, the Complaint does not adequately plead a violation of effective accommodation of athletic interests and abilities in the selection of sports offered or the levels of competition available, because Plaintiff does not address the First Circuit's effective accommodation test, nor does Plaintiff plead sufficient facts to support such a claim.

The First Circuit evaluates "effective accommodation" claims using a three-part test drawn from the 1979 Policy Interpretation. *Cohen v. Brown Univ.*, 991 F.2d 888, 896-97 (1st Cir. 1993). Under the test, a school's athletic program must satisfy any one of the following conditions: (1) "participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;" (2) the institution has "a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of [the underrepresented] sex;" or (3) "the interests and abilities of the members of [the underrepresented] sex have been fully and effectively accommodated by the present program." *Id.* at 897.

Plaintiff has not pled facts to support an effective accommodation claim against the Maine DOE. Plaintiff has not alleged – for any school in Maine, and certainly not at a statewide level – that the percentage of non-transgender girls enrolled in a school is substantially

disproportionate to the percentage of non-transgender girls in that school's athletics programs, or that non-transgender girls are underrepresented in school athletics. Instead, Plaintiff attempts to plead an effective accommodation claim by asserting that some non-transgender girls "have expressed [an] interest . . . in female-only sports teams and competitions." *Id.* ¶ 126. But neither Title IX nor the regulations provide such a right or otherwise mandate that girls' teams be limited by birth sex, *see* 34 C.F.R. § 106.41(a)-(b), *B.P.J.*, 2026 WL 1868739, at *7-9, precluding an effective accommodation claim on such basis. Although Title IX's regulations permit separate teams for sports involving competitive skill or contact to address competitive-fairness and safety considerations, *see* 34 C.F.R. § 106.41(b); *B.P.J.*, 2026 WL 1868739, at *7-9, that permission does not create an individual entitlement to a team composed exclusively of members who share a particular birth sex. Indeed, in certain circumstances, the regulations require that sex-separated teams provide try-outs for members of the opposite sex, § 106.41(b). There is therefore no categorical rule under Title IX that requires sex separation in athletics. Schools remain free to separate competitive teams by sex, or not, and Title IX requires only that they maintain overall "equal athletic opportunity" for members of both sexes, § 106.41(c), underscoring that Title IX's sex-separation provisions are tools for administering overall equal athletics programs and do not create freestanding individual rights to sex separation.

The three-part test also forecloses Plaintiff's conclusory allegation that the inclusion of transgender girls in girls' sports reduces the athletic opportunities for non-transgender girls. *See* Compl. ¶¶ 109, 122, 124. Even assuming this were true, which the Maine DOE disputes, this allegation is wholly inadequate to suggest that any school in Maine – let alone the entire state – fails all three prongs of the effective accommodation test. Under the first prong alone, for example, Plaintiff would need to plausibly allege that non-transgender girls' enrollment and

16

athletic participation opportunities at a given school are not "substantially proportionate" at a program-wide level – a standard that does not require exact proportionality and must account for "the institution's specific circumstances and the size of its athletic program." *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 855-57 (9th Cir. 2014). Instead, Plaintiff identifies only three transgender girls – at three different schools – who have allegedly "displace[d]" non-transgender girls in athletics. Compl. ¶¶ 100-125. Nor has Plaintiff pled facts addressing the second or third prongs. The Complaint does not allege that any Maine school has failed to expand or maintain athletic opportunities for non-transgender girls, foreclosing any argument under the second prong, and it does not allege that non-transgender girls' athletic interests and abilities are not being fully and effectively accommodated by existing programs, foreclosing the third prong as well. Because a plaintiff must show that a school's program fails all three prongs to state an effective accommodation claim, *see Cohen,* 991 F.2d at 897, the Complaint's silence as to the second and third prongs is independently fatal. This falls far short of the analysis required under First Circuit precedent. Under that analysis, moreover, it is simply not plausible that the participation of a single athlete could create a lack of substantial proportionality in a school's athletics program. *See id.*

The participation opportunities that Title IX protects do not encompass particular outcomes, such as advancing to finals or winning a medal. *See* 1979 Policy Interpretation, 44 Fed. Reg. at 71415 (defining "participants" in terms of receiving coaching, attending practice, and being listed in squad lists); *see also Cohen*, 991 F.2d at 896-97 (continuing to apply the 1979 Policy Interpretation); *Ollier*, 768 F.3d at 854 (same). Because participation, not victory, is the touchstone of the effective-accommodation inquiry, Plaintiff cannot plead a cognizable claim by selectively alleging instances in which a transgender girl placed ahead of a non-transgender girl.

17

*See, e.g.*, Compl. ¶¶ 103, 112, 117, 120. Moreover, even while Plaintiff relies on the false assumption that transgender girls are always physically advantaged compared to non-transgender girls, *e.g., id.* ¶¶ 4-5, 96, the Complaint lists numerous examples of non-transgender girls outperforming transgender girls, *id.* ¶¶ 112, 115, 117, 120 (alleging third-, fourth-, and fifth-place rankings of transgender girls). Because the 1979 Policy Interpretation measures accommodation by opportunity to participate rather than competitive outcome, and Plaintiff's own allegations confirm that non-transgender girls routinely outperformed the transgender athletes it identifies, neither the governing standard nor the Complaint's own facts support Plaintiff's "displacement" theory of an effective accommodation violation.

### 2. *Plaintiff Fails to State an Equal Treatment Claim.*

Section 106.41(c)(2)-(10) sets forth the standards for "equal treatment" in athletics under Title IX. An equal treatment claim focuses on "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes," such as "schedules, equipment, coaching, and other factors." *Mansourian*, 602 F.3d at 964-65 (citing 34 C.F.R. § 106.41(c)(2)-(10)). In the complaint, Plaintiff does not plead any facts to plausibly allege such a violation – *e.g.*, that non-transgender girls are treated differently with respect to the provision of equipment, per diem allowances, training facilities, or other benefits listed in § 106.41(c)(2)-(10). Instead, the Complaint attempts to create new categories for which equal treatment can be denied: "public visibility and recognition of athletic competition achievement, and increased opportunity for college athletic recruiting and scholarships." Even if Plaintiff had asserted facts pertaining to a cognizable category, equal treatment, like effective accommodation, is assessed at a "program-wide" level, *see* 44 Fed. Reg. at 71422, and Plaintiff has failed to

allege any program-wide disadvantage to non-transgender girls – let alone any such disadvantage stemming from transgender girls' participation in girls' sports in Maine schools.

3.  *Plaintiff Fails to Allege Any Violation of Overall Equal Athletic Opportunity.*

In the 1979 Policy Interpretation, the standards for "effective accommodation" and "equal treatment" also include factors for assessing the overall Title IX compliance of athletics programs. 44 Fed. Reg. at 71417-18. Overall compliance depends on whether an institution's policies "are discriminatory in language or effect," whether there are "substantial and unjustified" disparities "in the benefits, treatment, services, or opportunities afforded male and female athletes" at a program-wide level, or whether such "disparities in individual segments of the program" are so significant as to "deny equality of athletic opportunity." *Id.*

Plaintiffs do not, and cannot, allege any such violations. The requirements of the MHRA are gender-neutral, as all students are allowed to participate consistent with their gender identity. The Complaint does not allege facts suggesting that Maine designed or implemented its inclusive athletics policies with any intent to disadvantage non-transgender girls. Further, the Complaint pleads no facts to suggest that there are "substantial and unjustified" disparities limiting girls' access to interscholastic athletic opportunities in Maine. Nor could it: the MHRC's guidance already builds in a safeguard for all students by requiring an interactive discussion between the school and the student if participation on a single-sex/gender team poses a significant risk of substantial physical harm to the student or other participants, so as to minimize or eliminate that risk while still providing a mutually acceptable athletic opportunity. *See* supra n.3. Plaintiff has not plausibly alleged that the inclusion of transgender girls in girls' sports violates Title IX. Allegations about three transgender athletes, spread across three different schools, cannot support a claim that non-transgender girls are subject to disproportionalities or disparities in athletic

19

participation either in those programs or statewide. The "substantially proportionate" standard governing this analysis accounts for ordinary, minor fluctuations in program participation from year to year, and three individual athletes – even accounting for the multiple sports and seasons in which some of them participated – do not approach the level of a systemic, unjustified disparity that Title IX's overall-compliance standard requires when spread across an entire state. *See Cohen v. Brown Univ.*, 879 F. Supp. 185, 201-02 (D.R.I. 1995), *aff'd*, 101 F.3d 155 (1st Cir. 1996). Because nothing in the Complaint rises to the level of actionable discrimination under Title IX, judgment on the pleadings should be entered for Maine DOE on Count I.

III.     **Plaintiff's Claim for Breach of Contractual Assurances Fails**.

Plaintiff's claim for "breach of [the Maine DOE's] contractual assurance agreements" fails because the assurances promise nothing more than compliance with Title IX. Because Maine has not violated Title IX, it has not breached that promise.

A.   Plaintiff Fails to State a Breach of Contract Claim.

The USDOE's Title IX assurance of compliance requires recipients to assure they will comply with Title IX and its implementing regulations. *See* OMB Approval No. 1870-0503. The USHHS assurance similarly requires recipients to comply with Title IX's prohibition on discrimination "on the basis of sex," and notably has included "pregnancy, sexual orientation, and gender identity," which USHHS proposed changing only this year. *See* OMB Approval No. 0945-0008. Neither assurance defines prohibited conduct; both incorporate the statutory and regulatory requirements of Title IX by reference. *See Minor v. Northville Pub. Schs.*, 605 F. Supp. 1185, 1199 (E.D. Mich. 1985) (explaining that the assurance "is merely one step of a regulatory process designed to facilitate the enforcement of Title IX" and "creates no substantive

rights" beyond those in § 901). Maine's contractual obligations are thus coextensive with, and cannot exceed, its statutory obligations under Title IX.

Plaintiff's breach theory rests entirely on the premise that Title IX prohibits states from allowing transgender girls to participate in girls' athletics. But for the reasons explained above, Title IX does not compel that result. *See* Section II, *supra*. Maine has complied with Title IX consistent with the statute's plain language and controlling precedent. Because Maine has not violated Title IX, it has not breached its assurance.

The Executive Orders cannot expand Maine DOE's contractual obligations. *See City & Cnty. of San Francisco*, 897 F.3d at 1234-35; *Female Athletes United*, 172 F.4th at 1029. Nor can agency interpretations issued without notice-and-comment rulemaking alter the scope of a funding recipient's Title IX obligations. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 371, 413 (2024). Simply put, Plaintiff cannot bootstrap the Executive Orders into an enforceable contractual term.

In sum, even assuming the government may sue to enforce assurances under federal common law, *see United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 617 (5th Cir. 1980), Plaintiff's contract claim fails. The assurances promise nothing more than compliance with Title IX, and Maine DOE has complied. Judgment should be entered for Maine DOE on Count II.

B.  Plaintiff Is Not Entitled To Damages.

Plaintiff seeks the extraordinary remedy of "[a] damages award to the United States" for "breach of [Maine DOE's] contractual assurance agreements." Compl. ¶¶ 163, Prayer for Relief (d). This claim fails as a matter of law. Title IX permits private plaintiffs who are victims of discrimination to seek compensatory damages, *see Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992), but contains no provision authorizing damages to the United States itself.

The government's enforcement authority is limited to prospective, compliance-oriented relief—not backward-looking monetary awards that would enrich the federal treasury and punish Maine.

Title IX's enforcement scheme reflects this distinction. The statute provides two avenues for federal agency enforcement: (1) termination or refusal of federal financial assistance; and (2) any other means authorized by law. 20 U.S.C. § 1682. Both avenues are expressly limited to "effect[ing]" "[c]ompliance" with Title IX. *Id.* This compliance-oriented framework stands in stark contrast to the private right of action, which exists to compensate victims for the harm they have suffered. When the government sues, the sole purpose is to bring recipients into compliance—not to recover damages.

Plaintiff cannot circumvent these limits by recharacterizing its claim as one for "breach of contract." Even assuming assurance documents may be enforced as contracts—a proposition Maine does not concede—courts that have permitted the government to sue on such documents have done so only for prospective, equitable relief "necessary to enforce such assurances," not damages. *See Marion Cnty. Sch. Dist.*, 625 F.2d at 617 (holding government entitled to "whatever relief is necessary to enforce such assurances"). The "any other means authorized by law" language in Title IX authorizes compliance mechanisms; it does not transform the statute's enforcement scheme into a damages-generating vehicle for the federal treasury. *See Brown v. Califano*, 627 F.2d 1221, 1224 (D.C. Cir. 1980) (explaining that Spending Clause legislation "permits the Executive to *avoid providing support* to noncomplying public school districts, and to use *the threat of fund-termination to persuade or induce* recipients" to address discrimination).

DOJ regulations governing federal agency enforcement of Title IX confirm this compliance-focused framework. *See, e.g.*, 28 C.F.R. § 42.108 (Title VI regulations); *id.* § 54.605 (adopting Title VI regulations for Title IX enforcement). Those regulations provide that any

22

other means authorized by law may be used only "to induce compliance," *id.* § 42.108(a), and describe such means as "action[s] to effect compliance," *id.* § 42.108(d).

DOJ enforcement guidelines, prescribed by the Attorney General sixty years ago, further clarify the prospective nature of remedies under its enforcement authority. 31 Fed. Reg. 5292 (Apr. 2, 1966), *codified at* 28 C.F.R. § 50.3. Those guidelines describe the "alternative courses of action" available in the event of noncompliance. 28 C.F.R. § 50.3(a). Contrary to evincing a punitive function, the guidelines explain that "[i]n each case, the objective should be to secure prompt and full compliance so that needed Federal assistance *may commence or continue*." *Id.* § 50.3(a) (emphasis added). Moreover, the guidelines are explicit that "[t]he ultimate sanctions . . . are the refusal to grant an application for assistance and the termination of assistance being rendered." *Id.* § 50.3(c)(I)(A). The guidelines list "available alternatives" to termination, including court enforcement, but each option describes equitable relief—for example, "a suit to obtain specific enforcement of assurances," "a suit to enforce compliance" with other statutes, and initiation of or intervention in a suit "for other relief designed to secure compliance." *Id.* § 50.3(c)(I)(B)(1). Enforcement of assurances is thus limited to specific performance.

Courts have recognized that "referral to the Attorney General . . . to specifically enforce rights created under any assurance" is a "less drastic" measure than fund termination. *Nat'l Ass'n for Advancement of Colored People v. Wilmington Med. Ctr., Inc.*, 453 F. Supp. 330, 334 n.10 (D. Del. 1978). Plaintiff's theory turns this understanding on its head:  it would permit the United States to impose both funding termination and a damages judgment for prior disbursements—a remedy far more drastic than the statute or regulations contemplate, and an end-run around the administrative hearing process Title IX requires before fund termination. 20 U.S.C. § 1682.

Such "damages" bear no resemblance to compensatory relief for discrimination victims; they would function as a windfall to the federal treasury, recouping funds the Maine DOE has already spent on health and educational programs. Even in ordinary contract disputes, rescission and restitution are extraordinary remedies reserved for breaches that "so substantially impair[] the value of the contract" as to justify unwinding the transaction. *See* Restatement (Second) of Contracts § 243(4). And restitution is limited to "the reasonable value to the other party of what he received," *id.* § 372 – not blanket forfeiture of all disbursed funds. *Cf. Bell v. New Jersey*, 461 U.S. 773, 780–87 (1983) (limiting federal recovery to amounts actually misused).

This interpretation accords with civil rights statutes generally, which permit the United States to seek equitable relief and, sometimes, damages on behalf of private victims – but not damages to enrich the government itself. *See, e.g.*, 42 U.S.C. § 1997a (CRIPA – equitable relief); 42 U.S.C. § 3614(d) (Fair Housing Act – civil penalties and damages for "aggrieved persons," not for the United States); 42 U.S.C. § 2000cc-2(f) (RLUIPA – injunctive or declaratory relief). Plaintiff does not seek damages on behalf of any discrimination victim; it seeks to recover federal funds for the federal treasury. Title IX does not authorize that remedy.

Spending Clause principles independently bar this relief. "[A] particular remedy is . . . 'appropriate relief' . . . only if the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219-220 (2022) (*quoting Barnes v. Gorman*, 536 U.S. 181, 187 (2002)). The Maine DOE may have been on notice of suit by private plaintiffs seeking compensation for discrimination, but it was never on notice that the United States could sue to recoup millions of dollars in previously disbursed funds for the federal treasury. No statute, regulation, or assurance warned of such exposure. Such "damages" are not "traditionally available in suits for breach of

contract," *Barnes*, 536 U.S. at 187-88; they function as a penalty that "has no place in our Spending Clause jurisprudence." *Cummings*, 596 U.S. at 226. Judgment should, therefore, be entered for Maine DOE on Plaintiff's damages claim.

## CONCLUSION

For all the foregoing reasons, the Maine DOE respectfully requests that the Court grant its Motion for Judgment on the Pleadings.

Dated:  July 31, 2026

AARON M. FREY
Attorney General

/s/ Sarah A. Forster
SARAH A. FORSTER
Assistant Attorney General
Sarah.Forster@maine.gov
KATHERINE W. THOMPSON
Special Counsel
Kate.Thompson@maine.gov
Office of the Attorney General
State House Station 6
Augusta, ME 04333
Telephone: (207) 626-8800

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2026, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record. To my knowledge, there are no non-registered parties or attorneys participating in this case.

/s/ Sarah A. Forster
SARAH A. FORSTER
Assistant Attorney General
Six State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Sarah.Forster@maine.gov

25