**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAINE DEPARTMENT OF EDUCATION,<br><br>Defendant. | Case No. 1:25cv00173-SDN |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION**
**FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 2

A. The Title IX Statute and Implementing Regulations ........ 2

B. Maine's Gender Identity Policy For Interscholastic Sports ........ 3

III. LEGAL STANDARD ........ 5

IV. ARGUMENT ........ 6

A. Title IX Prohibits Defendant's Exception for Boy Athletes Who Identify as Girls. ........ 7

1. Title IX Prohibits Discrimination On The Basis Of "Sex" Not "Gender Identity." ..... 7

2. The Biological Differences Between The Sexes Provide The Non-Discriminatory Justification For Sex-Separated Sports. ........ 8

3. Maine's Gender Identity Policy Violates Title IX By Harming Girls And Depriving Them Of Equal Opportunities. ........ 11

4. The Athletics Regulations Further Confirm Maine's Gender Identity Policy Violates Title IX and Girls' Equal Opportunities. ........ 14

5. MDOE's Proposed Application Of The Policy Interpretation of the Regulation Conflicts With Title IX. ........ 16

B. Defendant Had Clear Notice That Title IX Prohibits Its Gender Identity Exception. ...... 19

C. Defendant Violated Its Contractual Assurances. ........ 23

V. CONCLUSION ........ 25

# I. INTRODUCTION

Maine interscholastic sports "are generally zero sum. Allowing a biological male athlete to compete on a girls' team *necessarily* displaces or disadvantages a female athlete—replacing her on the roster, knocking her out of the starting lineup, reducing her playing time, depriving her of a medal, and the like." *W. Virginia v. B.P.J.*, 146 S. Ct. 2356, 2372 (2026).

Despite this biological reality, Defendant's actions implementing the Maine Human Right Act and its preference for "gender identity" force girls to play on an uneven playing field. Defendant forces girls to compete against boys who possess inherent physical advantages over them, causing a clear lack of equal opportunity, inherent unfairness, and risk of injury. Title IX prohibits this reprehensible unfairness as unlawful sex discrimination. 20 U.S.C. § 1681.

Defendant moves for judgment on the pleadings, ECF No. 102, claiming Title IX permits an exception allowing boys who identify as girls to compete in sports specifically designated only for girls. But biological "sex" is the only non-discriminatory reason educational programs can separate sports in the first place, not trans-identifying status. Title IX permits educational programs to separate competitive sports by sex *only* because the inherent biological differences between the sexes naturally give males an unfair advantage and cause risk of injury. But Defendant's exception for trans-identifying males jettisons biology as the justification for separation and causes an imbalanced, unfair disadvantage to female athletes. This violates both the underlying biological justification for separating sports by sex and Title IX's overriding command that the sex-separation in athletics cannot disadvantage either sex.

Defendant seeks to sidestep its Title IX violation, claiming lack of notice under the Spending Clause that its exception for trans-identifying males violates Title IX. But the plain meaning of the statute, the implementing regulations, and multiple court decisions provided more than ample notice. Defendant further claims the United States cannot sue for breach of the

contractual assurances Defendant entered into promising compliance with Title IX. The United States, however, has a common law right to sue for breach of its contracts, like any other party.

Defendant invites this Court to adopt its discriminatory preference for gender identity and to ignore the biological reality that boys playing in girls' sports is manifestly unfair, harmful to girls, and sex discrimination. Title IX clearly blocks accepting that invitation; this Court should deny Defendant's motion.

## II. BACKGROUND

### A. The Title IX Statute and Implementing Regulations

Enacted in 1972, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute does not expressly use the terms "sports" or "athletics." The United States Departments of Education ("USDOE") and Health and Human Services ("HHS") have promulgated implementing regulations that explain Title IX's application to athletics. 34 C.F.R. § 106.41 (USDOE); 45 C.F.R. § 86.41 (HHS). Congress directed the promulgation of these regulations through the Javits Amendment. Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974).

The athletics regulations first declare a general prohibition of the use of sex in athletics, providing that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a); 45 C.F.R. § 86.41. The regulations then provide an exception to that general prohibition by allowing some separation by sex, namely that "a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity

involved is a contact sport." 34 C.F.R. § 106.41(b); 45 C.F.R. § 86.41(b). The regulations further provide that "[a] recipient which operates or sponsors interscholastic . . . athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); 45 C.F.R. § 86.41(c).

## B. MAINE'S GENDER IDENTITY POLICY FOR INTERSCHOLASTIC SPORTS

The Complaint alleges that "the inherent physiological differences between the two sexes make them generally dissimilarly situated in athletics. These physiological differences exist regardless of how a person identifies. Because of these physiological differences, providing athletic teams, competitions, and events for girls has long ensured that female student athletes are afforded an equal, and equally safe, opportunity to participate and effectively compete, and thereby to enjoy the same educational benefits from sports as boys." Compl. ¶¶ 4–5, ECF No. 1.

Defendant discards this biological reality in its provision of interscholastic athletics for girls. Defendant MDOE's "policies and actions are harming girls by denying girls the opportunity to compete in student sports on a level playing field in which they have the same opportunities as boys. Defendant's athletics policies and practices unfairly force girls to compete against [trans-identifying] boys in competitions designated for girls." Compl. ¶ 2. In violation of Title IX, "[t]hese policies and actions discriminate on the basis of sex and harm female student athletes under Defendant's educational charge." Compl. ¶ 2.

This suit primarily concerns Title IX's preemption of Maine's Human Rights Act ("MHRA"). In 2021, Maine amended its MHRA to explicitly include "gender identity" discrimination in educational programs. *See* Me. Rev. Stat. Ann. tit. 5, § 4601; Compl. ¶ 37. The MHRA treats "sex" and "gender identity" as different categories. For athletics, the MHRA declares: "It is unlawful educational discrimination [to] on the basis of sex, sexual orientation or gender identity . . . [d]eny a person equal opportunity in athletic programs." Me. Rev. Stat. Ann. tit. 5, § 4602; Compl. ¶ 39.

State law charges Defendant MDOE with control over public school interscholastic athletics and obligates it to ensure equal athletic opportunities for boys and girls. *See* Compl. ¶¶ 31–33. Defendant also administers federal grants, distributes the federal funding to subrecipient schools, and has entered into contractual assurance agreements that require it to ensure compliance with Title IX. *See* Compl. ¶¶ 11, 88, 132–35; Answer ¶¶ 11, 132–35, ECF No. 60.

Despite its obligation and authority to control interscholastic athletics, Defendant has effectively ceded that responsibility to the Maine Principals' Association ("MPA"). Compl. ¶¶ 45–56. The MPA has enacted an athletics participation bylaw, currently entitled the "Gender Identity Participation Policy," that conflicts with Title IX and the implementing athletics regulations and discriminates against girl student athletes. Compl. ¶¶ 57–84. The MPA separates many sports by biological sex, designating some teams specifically for boys and some teams specifically for girls. Compl. ¶¶ 58, 67–68. This separation by sex aligns with the MDOE's currently in effect joint rule (with the Maine Human Rights Commission) that, like Title IX, prohibits discrimination based on "sex." Particularly for athletics, Defendant's joint rule requires "equal opportunity" for "both sexes" and authorizes "single-sex team[s]." Compl. ¶¶ 40–43.[1] Defendant's joint rule does not mention "gender identity." Compl. ¶ 44.

The MPA's Gender Identity Participation bylaw, however, allows some boys—those who identify as girls—to participate on teams designated for girls. Compl. ¶ 58. The Gender Identity Participation bylaw has gone through multiple iterations since 2021, initially recognizing that boys competing in girls' sports can harm girls' equal opportunities, result in unfair athletic advantage, and present an unacceptable risk of injury. Compl. ¶¶ 60–66. The current (2023-2024) Gender Identity Participation bylaw deletes these admissions regarding equal opportunities, biological

[1] *See also* https://www.law.cornell.edu/regulations/maine/05-071-C-M-R-ch-4-SS-11.

advantage, and injuries. Compl. ¶¶ 68–75. The inherent biological differences between boys and girls, however, obviously remain the same.

Despite ceding control to the MPA, Defendant, as a recipient of federal funding, has a non-delegable legal duty under Title IX to ensure compliance with Title IX at all Maine educational institutions receiving federal funding; this legal duty persists regardless of whether MDOE has delegated the MPA certain athletic governance functions. Compl. ¶¶ 85–91. Defendant admits it has not made efforts to change MPA's Gender Identity Participation bylaw. Compl. ¶¶ 81–84, 92; Answer ¶¶ 81–84, 92.

The Complaint also explains how Defendant's failure to stop the MPA's Gender Identity bylaw denies equal benefits and opportunities to girls. Compl. ¶¶ 94–131. The Complaint gives examples of three trans-identifying boys competing in and winning multiple sports designated specifically for girls; it further alleges that "boy athletes have competed in, and will continue to compete in, athletic sports and competitions designated for girls, and have displaced, and will continue to displace, girls and harm their equal educational athletic opportunities due to the discriminatory polices MDOE has facilitated and failed to stop." Compl. ¶¶ 99–125.

After failed attempts to secure Defendant's voluntary compliance with Title IX, on April 16, 2025, the United States sued, alleging MDOE is: (1) violating Title IX, Compl. ¶¶ 154–59; and (2) breaching its contractual assurances, Compl. ¶¶ 160–64.

## III. LEGAL STANDARD

In deciding a motion for judgment on the pleadings under Rule 12(c), the court applies the same standards for a Rule 12(b) motion to dismiss but considers both the complaint and the answer. *Martin v. Somerset Cnty.*, 86 F.4th 938, 942 (1st Cir. 2023).[2] The court should accept all the

[2] The court has discretion to consider supplemental documents that are sufficiently referred to in the complaint or central to the claims. *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007). But Rule 12(d) counsels that considering

plaintiff's well-pleaded factual averments as true and draw all reasonable inferences in its favor. *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549 (1st Cir. 2016). A complaint's factual allegations need only be "enough to raise a right to relief above the speculative level," and go beyond a formulaic recitation of the elements of the asserted cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Judgment on the pleadings should be denied unless "it appears beyond a doubt that the nonmoving party can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Cintron v. Bibeault*, 148 F.4th 37, 46 (1st Cir. 2025).

## IV. ARGUMENT

Defendant's policies and actions applying the MHRA and the MPA's bylaw[3] to interscholastic sports designated for girls (collectively Defendant's "gender identity policy") violate Title IX. Defendant disputes that this is a Title IX violation, that it had clear notice under the Spending Clause that this violated Title IX, and that the United States can sue for breach of the contractual assurances. *See generally* Defs. Mot. for Judgment on Pleadings, ECF No. 102. Those arguments fail because: (A) Title IX prohibits Defendant's exception for boy athletes who identify as girls because that exception breaks the biological justification for separating sports and harms girls; (B) Defendant had clear notice that its exception violates Title IX based on the plain meaning of the statute, the regulations, and multiple court decisions;[4] and (C) the United States has a common law right to sue for breach of contract, like any other party.

---

these supplemental materials could convert the motion into one for summary judgment. *See also Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 18–19 (1st Cir.1992) (declining to convert motion).

[3] Defendant (at 10) submits that "the policies of the MPA [are] designed to align with the MHRA."

[4] This Court should deny Defendant's request (at 12) to determine the constitutional Spending Clause notice challenge first rather than starting by addressing the Title IX issue. This request defies the "fundamental and longstanding principle of judicial restraint [that] requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *accord Burton v. United States*, 196 U.S. 283, 295 (1905) (Courts should avoid "decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case."). This principle applies even more forcefully here because Defendant appears to argue that only a definitive court ruling of a Title IX violation can provide the necessary notice for the

### A. Title IX Prohibits Defendant's Exception for Boy Athletes Who Identify as Girls.

Defendant's gender identity policy violates both Title IX itself and, independently, the statute's implementing regulations. Title IX prohibits discrimination on the basis of "sex," and does not mention or encompass MDOE's preferred "gender identity" classification. Biological "sex" is the only grounding justification that educational programs can use to separate sports in the first place. Title IX's prohibition of sex discrimination permits educational programs to separate competitive sports by sex *only* because the "inherent physical differences relevant to athletic performance" between the sexes naturally give males an unfair advantage. *B.P.J.*, 146 S. Ct. at 2367. Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not prohibited "discrimination" when such separation does not treat either sex worse than the other. *See id.* at 2372.

In comparison, Defendant's gender identity policy violates Title IX because it treats female athletes worse than males. The policy violates both the underlying biological justification for separating sports and Title IX's overriding command that the sex-separation in athletics cannot disadvantage either sex. Contrary to Title IX, Maine's gender identity policy jettisons biology as the justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

#### 1. Title IX Prohibits Discrimination On The Basis Of "Sex" Not "Gender Identity."

Title IX prohibits discrimination on the basis of "sex" according to that term's plain biological and binary (male/female) meaning, not gender identity. In *B.P.J.*, the Supreme Court confirmed that the "term 'sex' in the 1972 Title IX statute" and "the 1975 Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex. The ordinary

---

Spending Clause. But if there is never clear notice because a court never reaches the Title IX issue, that would absurdly leave Defendant free to violate Title IX in perpetuity.

meaning of the term 'sex' at the time of enactment in the early 1970s was biological sex and not gender identity, particularly in the sports context." *B.P.J.*, 146 S. Ct. at 2371 (citation omitted).[5]

**2. The Biological Differences Between The Sexes Provide The Non-Discriminatory Justification For Sex-Separated Sports.**

Title IX permits educational programs to separate competitive sports by sex only because the biological differences between the sexes naturally give males an unfair advantage and cause safety risks in sports. Because of this male advantage, the sexes are not similarly situated in athletics, and separating sports teams by sex is not "discrimination" prohibited under Title IX when such separation does not treat members of either sex worse than the other.

Title IX carries "the 'normal definition of discrimination.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (citation omitted). And the "ordinary meaning of the word 'discrimination'" is treating individuals or groups that "are similarly situated differently without sufficient justification for the difference in treatment." *Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (quotation marks omitted); *see, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657–58 (2020) (finding discrimination means "treating that individual worse than others who are similarly situated"). Title IX thus prohibits subjecting members of one biological sex to less favorable treatment than similarly situated members of the other sex. *Jackson*, 544 U.S. at 174.

Because the two sexes are usually similarly situated when it comes to educational programs, Title IX usually prohibits sex separation. For example, the statute prohibits separate male and female math classes because for classes the two sexes are similarly situated; biological sex is irrelevant. Biological sex, however, is highly relevant to athletics. The *B.P.J.* Court

[5] Defendant claims confusion (at 12-13) as to whether the United States is relying on Executive Orders for their interpretation of Title IX. The United States does not and need not rely on those Orders because "sex" in Title IX has always meant biological sex and Title IX has always authorized the United States to enforce the statute and the only plausible meaning of "sex"; the Executive Orders are simply "[c]onsistent with 'sex' meaning biological sex in Title IX." Compl. ¶ 23.

confirmed that "[s]ports are different from" "a typical employment or educational opportunity where equal protection often may require that the government generally treat an individual *without regard to the individual's sex*." 146 S. Ct. at 2376. But in the sports context, "distinctions based on sex" are not discriminatory "because"—and only because—"of the inherent physical differences between women and men." *Id.*[6]

"[B]iological males generally possess inherent physical advantages in sports—in height, weight, strength, speed, endurance, jumping ability, and the like." 146 S. Ct. at 2374; *accord id.* at 2367. These inherent physical differences justify separating sports by sex to ensure "competitive fairness" because "allowing biological males to play on women's and girls' sports teams can put female athletes at a serious disadvantage." 146 S. Ct. at 2372. The *B.P.J.* Court emphasized that, because sports generally are "zero sum," "[a]llowing a biological male athlete to compete on a girls' team *necessarily* displaces or disadvantages a female athlete—replacing her on the roster, knocking her out of the starting lineup, reducing her playing time, depriving her of a medal, and the like." *Id.*; *accord id.* at 2375. Beyond just competitive fairness, physical differences justify separation because "allowing biological males to play on women's and girls' sports teams can put women and girls at significant risk of injuries." *Id.* at 2372.

Separating sports by sex is therefore generally not "discrimination" under Title IX because it treats similarly situated individuals equally by distinguishing the sexes based on relevant biological differences. This separation is "not invidious, but rather realistically reflects the fact

[6] *See also id.* at 2390–91, 2402 (2026) (Sotomayor, J., concurring in judgment in part and dissenting in part) ("[T]here are inherent physical differences between males and females, as defined by sex identified at birth, making them differently situated generally when it comes to many sports . . . there are plenty of contexts outside of athletics in which Title IX applies and does not allow sex distinctions like this one . . . [such as] mandatory sex-segregated classes or extracurricular activities like chess club, theater, and student government." (citation omitted)); *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) ("It is imperative to recognize that athletics presents a distinctly different situation from admissions and employment and requires a different analysis in order to determine the existence *vel non* of discrimination.").

that the sexes are not similarly situated" in sports. *Id.* at 2377 (quoting *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981)).

*B.P.J.* aligns with previous Supreme Court decisions repeatedly confirming that biology is sometimes highly relevant and the sexes are sometimes dissimilarly situated. The Court thus has upheld, as non-discriminatory, laws that made distinctions accounting for real biological differences between the sexes. *Michael M.*, 450 U.S. at 471 (upholding statutory rape law focused on protecting girls because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse"); *Nguyen v. I.N.S.*, 533 U.S. 53, 63 (2001) (upholding statute making it easier to claim citizenship for a child born abroad to an American mother than to an American father because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood"); *United States v. Virginia*, 518 U.S. 515, 533–34 (1996) (noting "[i]nherent differences" between the sexes, and finding sex-based classifications may be used to compensate women for particular disabilities, promote equal opportunity, and "advance full development of the talent and capacities of our Nation's people." (citations omitted)); *id.* at 550 n.19 (recognizing a formerly male-only school, once integrated, "undoubtedly" would have to "adjust aspects of the physical training programs" in light of "physiological differences between male and female individuals").

The "[p]hysical differences between men and women are 'enduring,'" *B.P.J.*, 146 S. Ct. at 2367 (quoting *Virginia*, 518 U.S. at 533), and to account for them, schools "typically maintain separate women's and men's sports teams" to "ensure equal opportunity for female athletes," *id.* Because males have an unfair physical advantage that makes them not similarly situated to females in athletics, separating sports by sex is not "discrimination" under Title IX when the separation

does not treat either sex worse than the other. But when the separation *does* treat one sex worse, the separation becomes discrimination prohibited by Title IX.

### 3. Maine's Gender Identity Policy Violates Title IX By Harming Girls And Depriving Them Of Equal Opportunities.

Defendant's gender identity policy treats females worse than males. The policy violates both the underlying justification for separating sports and Title IX's overriding command that the sex separation in athletics cannot disadvantage either sex. Contrary to Title IX, Maine's gender identity policy jettisons biology as its justification for separation and causes an imbalanced, unfair disadvantage to female athletes.

As above, the physical advantages of males make the sexes dissimilarly situated in athletics and provides the only justification for why Title IX does not prohibit separating teams by sex as discrimination. Maine's policy breaks this justification. Title IX prohibits an educational program from allowing some male athletes to compete on female teams because that directly undermines the justification for separating the sports by male and female in the first place. Although sex-separated athletics are not ordinarily discriminatory under Title IX, that is because such classification is permissibly accounting for real biological differences between women and men to avoid subjecting women to a competitive disadvantage and injury. When an educational program such as MDOE's chooses to allow some male athletes to compete on female teams, thereby subjecting females to an unfair competitive disadvantage, it severely undermines its justification for separating the teams at all. In other words, since Maine's gender identity policy disregards the real biological differences between boys and girls, Defendant is now "discriminating" by separating the sexes without any valid basis—and at the same time disadvantaging one of the sexes. Having abandoned the biological justification, Maine's gender identity policy is akin to separated math classes where there are no relevant biological differences between the sexes.

Defendant implies (at 13) that Title IX would allow sports separated by gender identity. This is irrelevant here because as explained, Defendant is not separating athletics by gender identity: It separates by *sex*, but provides an exception to that separation for trans-identifying males. *See* Compl. ¶¶ 40–44, 58, 67–68.[7] But even if Defendant were purporting to separate by gender identity that would violate Title IX. Gender identity is not tied to biology and thus is obviously irrelevant to sports, making any purported gender identity separation an unlawful obvious irrational proxy for sex discrimination. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("Some activities may be such an irrational object of disfavor that" they are obviously proxies and "an intent to disfavor that class can be readily presumed. A tax on wearing yarmulkes is a tax on Jews.").[8]

Defendant urges (at 13) that Title IX should allow inclusive policies for trans-identifying athletes. But what is inclusionary for trans-identifying boys is exclusionary for the biological girls forced to compete against them at a physical disadvantage. *See B.P.J.*, 146 S. Ct. at 2372 ("Sports are generally zero sum. Allowing a biological male athlete to compete on a girls' team necessarily displaces or disadvantages a female athlete."). Again, this policy cannot override that biology (and not gender identity) justifies separation under Title IX, and that the separation cannot disadvantage

[7] This Court should disregard Defendant's improper attempt (at 4, 19) to use a 2016 Policy Guidance by the Maine Human Rights Commission. That document is not incorporated into the Complaint (or Defendant's Answer) and allowing it here would convert the present motion into one for summary judgment—and unfairly so because the United States has yet to take any discovery on this document. *See* Fed. R. Civ. P. 12(d). Regardless, that Policy Guidance also confirms that Maine separates sports into "single-sex/gender teams" and then athletes can participate on those single-sex teams consistent with their "gender identity." Defendant also relays (at 19) that the 2016 Policy Guidance has a "safeguard" requiring a discussion if the male athlete "poses a significant risk of substantial physical harm," but the MPA is not following that guidance and has deleted all references to injuries in its Gender Identity Participation Policy. *See* Compl. ¶¶ 60–84.

[8] Gender identity separation seemingly would violate Maine's own MHRA statute prohibiting gender identity discrimination. Separating by gender identity is not tied to the biological differences that make the sexes dissimilarly situated in athletics; athletes' gender identities do not make them dissimilarly situated. Defendant thus would have no non-discriminatory justification for separating sports by gender identity. Put differently, for two similarly situated boys, Maine allows only the trans-identifying boy to play on the girl's team—that is discrimination based on gender identity prohibited by the MHRA pure and simple. *See B.P.J.*, 146 S. Ct. at 2377 n.4.

either of the sexes. The rationale that generally justifies sex-separated athletics under Title IX applies equally to athletes who are trans-identifying, "meaning that their gender identity does not align with their biological sex." *United States v. Skrmetti*, 605 U.S. 495, 501 (2025). Regardless of whether these athletes *identify* with the opposite sex, they possess the *biology* of their own sex. Their subjective gender identity has nothing to do with the objective biological differences justifying sex-separated sports. Accordingly, Title IX's barring a trans-identifying male from competing on female teams is not providing that trans-identifying male less favorable treatment than females receive. *Jackson*, 544 U.S. at 174. Rather, it is ensuring *equal* treatment for both sexes and not unfairly harming female athletes—exactly what Title IX requires.[9] *See B.P.J.*, 146 S. Ct. at 2377 ("[T]he Equal Protection Clause does not prohibit the States from applying that same principle to all biological males, including those who identify as *female*.").

Put differently, Maine's gender identity policy is instituting a preferential "accommodation" on the basis of gender identity. *See Doe 2* v. *Shanahan*, 917 F.3d 694, 707 (D.C. Cir. 2019) (Williams, J., concurring) (rejecting challenge to sex-separated military facilities and standards). According to Maine's policy, while some males are validly excluded from competing against females, other males must be allowed to do so—despite the objective, inherent, physiological advantages that they too have as males—merely because they subjectively identify as females. This flips Title IX on its head by requiring schools to discriminate in favor of some males at the expense of and harm to females.[10]

[9] Title IX permits schools to allow girls to participate in boys' sports where consistent with safety and privacy, as doing so would not afford girls the competitive biological advantage that boys would gain if allowed to participate in girls' sports. *E.g.*, *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1130 (9th Cir. 1982) (finding "precluding boys from playing on girls' teams, even though girls are permitted to participate on boys' athletic teams," is "a legitimate means of providing athletic opportunities for girls"). Allowing girls to play in boys' sports thus does not subject any athlete to less favorable' treatment based on that athlete's sex. *Jackson*, 544 U.S. at 174.

[10] *See also supra* note 8.

Moreover, Maine's gender identity policy also clearly violates Title IX's "core" purpose of ensuring "[e]qual opportunity to participate." *Cohen v. Brown Univ.*, 991 F.2d 888, 897 (1st Cir. 1993) ("*Cohen I*"); *but see* Answer ¶ 3 (denying this core purpose). The 1972 law was "a belated but historic response to persistent discrimination against women in educational institutions, including in athletics." *B.P.J.*, 146 S. Ct. at 2368. "Few laws have been as effective and consequential in day-to-day American life as Title IX . . . . [a]bout 3.5 million high school girls now play sports." *Id.* (citation omitted). "In 1971, before Congress enacted the statute, approximately 300,000 girls and 3.67 million boys played competitive high school sports nationwide." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). The "lessons and experiences in sports have empowered millions of American women who have gone on to thrive in all aspects of American life." *B.P.J.*, 146 S. Ct. at 2368. "[D]etermin[ing] eligibility for women's and girls' teams based on biological sex" is "justified by the vitally important interests in safety and competitive fairness so as to provide equal opportunities for women and girls to participate in sports." *Id.* at 2380. This further confirms that Maine's policy violates Title IX. *See Abramski* v. *United States*, 573 U.S. 169, 179 (2014) ("[The Court] must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (quotation marks omitted)).

This Court thus should accordingly find MDOE's gender identity policy violates Title IX.

**4. The Athletics Regulations Further Confirm Maine's Gender Identity Policy Violates Title IX and Girls' Equal Opportunities.**

The decades-old athletics regulation that expressly contemplates sex-separated athletics and requires equal athletic opportunities confirms that Defendant's gender identity policy violates Title IX. *See* 34 C.F.R. § 106.41. The athletics regulation interpreting Title IX was "'issued contemporaneously with the statute' and has 'remained consistent over time,' it [therefore] is

'especially useful in determining the statute's meaning.'" *B.P.J.*, 146 S. Ct. at 2371 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)).

Like the statute, that regulation first generally prohibits sex discrimination in athletics. 34 C.F.R. § 106.41(a). Like the statutory analysis above, the regulation then recognizes the physical differences in athletics by clarifying that programs can separate teams "for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b); *see B.P.J.*, 146 S. Ct. at 2371 ("[T]he Title IX regulations allow[ ] separate sports teams precisely because of the biological differences between the sexes—namely, the inherent physical differences between biological women and biological men . . . [b]y referring to contact sports and competitive skill, the regulations plainly recognized the inherent physical differences between biological men and biological women—as well as the safety and competitive fairness concerns that would arise if males were allowed to compete in female sports."). But also like the analysis above, the regulation requires that this separation and the program overall cannot harm one of the sexes, but rather must still "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(b).

Like the statute, the regulation uses "sex," not gender identity, and provides no exception to biology-based sex-separation for some males.[11] Most importantly, the regulation requires any sex separation not harm girls, but instead provide them "equal athletic opportunity." 34 C.F.R. § 106.41(c). While male sports maintain fair and safe competition in Maine, Defendant's gender identity policy forces female athletes to participate in unfair and unsafe competition, where female

[11] Males do not fit into the regulation's "try-out" exception when a program offers a sport for one sex only and "athletic opportunities for members of [the excluded] sex have previously been limited." 34 C.F.R. § 106.41(b).

athletes risk injury and are deprived of awards and advancement, showing the discriminatory policy denies girls equal athletic opportunities. *See*, *e.g.*, Compl. ¶¶ 1–2, 8, 90–95.

This Court should accordingly find that the Title IX regulation, and its equal opportunity mandate, further confirms that Maine's gender identity policy violates Title IX.

**5. MDOE's Proposed Application Of The Policy Interpretation of the Regulation Conflicts With Title IX.**

Defendant attempts (at 14-20) to invoke an inapplicable Policy Interpretation from 1979, 44 Fed. Reg. at 71415, to argue that the United States does not bring a "traditional" claim and thus the claim is not "valid." MDOE seemingly submits that all Title IX claims involving sports must be rigidly analyzed as "effective accommodation" or "equal treatment" claims according to that Policy Interpretation. But there's nothing "traditional" here about boys competing in sports designated for girls. Maine's gender identity policy that discards biology violates the statute and makes that Policy Interpretation of the regulations irrelevant and inapplicable.

The Policy Interpretation, and the First Circuit's "effective accommodation" and "effective treatment" precedents, all concern potential inequalities in *properly sex-separated* athletics programs. The 1979 Policy Interpretation was geared toward analyzing particular aspects of programs that already purported to separate by sex and only sex. Here, Maine never makes it that far. Its gender identity policy does not purport to separate only by sex, but also has an overriding exception for gender identity. MDOE's failure to properly separate by sex in the first place causes a Title IX violation because of the gender identity policy's *improper separation* itself, before getting to any secondary analysis of "effective accommodation" and "equal treatment."

Beyond the failure to properly separate teams by sex in first instance, applying the Policy Interpretation here runs into other applicability problems. Like the statute itself, the Policy Interpretation from 1979, and the First Circuit cases addressing it, deal with "sex" not "gender

identity." *See Cohen I*, 991 F.2d at 896–97; *Cohen v. Brown Univ.*, 101 F.3d 155, 173 (1st Cir. 1996) ("*Cohen II*"). More importantly, these circuit precedents dealt not with males competing in female designated sports, but instead with the elimination of female designated varsity teams. *See Cohen I*, 991 F.2d at 892. These "traditional" First Circuit cases also analyzed in terms of binary biological sex, not the non-binary fluid concept of gender identity. *See, e.g.*, *Cohen II*, 101 F.3d at 177 (addressing "single-sex teams" where "men and women do not compete against each other for places on team rosters" and noting separate "athletics opportunities [cannot] disadvantage *either gender*." (emphasis added)). This circuit precedent from the 1990s thus supports the United States, not Defendant.

Moreover, the athletic regulation itself overall requires "equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c), and then explains that the effective accommodation factor, *id.* § 106.41(c)(1), and equal treatment factors, *id.* § 106.41(c)(2)-(10), are non-exhaustive "factors" to consider. *See Cohen II*, 101 F.3d at 166 (noting "Effective Accommodation" is the first of 34 C.F.R. § 106.41(c)(1)'s "*non-exhaustive list* of ten factors to be considered in determining whether equal athletics opportunities are available to *both genders*" (emphasis added)). This Court can and should consider Defendant's overriding exception for trans-identifying males as a dispositive factor "because sports are generally zero sum. Allowing a biological male athlete to compete on a girls' team *necessarily* displaces or disadvantages a female athlete." *B.P.J.*, 146 S. Ct. at 2372; *see also id* at 2367 ("To provide equal opportunity for female athletes, schools do not merely maintain, for example, one soccer team, one basketball team, [etc.] that are equally open to female and male athletes" because that "approach would deny equal opportunity to female athletes because, as all agree, females and males have inherent physical differences relevant to athletic performance."). This Court should accordingly reject Defendant's

argument that violations of Title IX and equal opportunity can only come in the form of the Policy Interpretation and rigid applications of traditional "effective accommodation" and "equal treatment" claims. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 310–11 (2025) (affirming discrimination depends on factual context, and tests for employment discrimination "never intended to be rigid, mechanized, or ritualistic" (citation omitted)).

Moreover, the United States has also plausibly alleged facts to support a claim under Defendant's rigid application of the Policy Interpretation, even if that were required. The Complaint contains an entire section with 38 paragraphs entitled "*MDOE's Failure to Stop the Maine Principals' Association's Athletics Participation Bylaw Denies Equal Benefits and Opportunities to Girl Athletes.*" Compl. ¶¶ 94–131. The Complaint alleges that MDOE's actions "cause[] disparities of a substantial and unjustified nature in the benefits, treatment, services, and opportunities afforded to female athletes." Compl. ¶ 95. It provides examples of trans-identifying boy athletes competing in and winning sports designated for girls, and alleges that "other boy athletes have competed in, and will continue to compete in, athletic sports and competitions designated for girls, and have displaced, and will continue to displace, girls and harm their equal educational athletic opportunities due to the discriminatory polices MDOE has facilitated and failed to stop." Compl. ¶¶ 99–125.[12]

Defendant's gender identity policy violates the Policy Interpretation's guidance that overall policy should not be "discriminatory in language or effect." *See* 44 Fed. Reg. at 71418 (for

[12] Defendant harps (at 17, 19-20) on the Complaint listing only three example athletes. This is irrelevant to the outright violation of the Title IX statute itself. *See supra* Part IV.A.3. Regardless, the Complaint lists them as examples. This Court should note that, as the United States predicted, Defendant is already attempting to capitalize on this Court's denial of United States' attempted discovery of additional athletes. *See* Order [Affirming Magistrate's Order Quashing U.S. Subp. in part] at 2-7, ECF No. 93; *cf.* U.S. Obj. [to Magistrate's Order] at 7 (submitting "if the [Magistrate's] Quash Order's denial of this evidence stands, the Defendant should be prohibited from arguing to this Court or urging to any jury that this evidence is necessary or relevant to, or absent from, the United States' case and claims").

effective accommodation claims); *id.* at 71,417 (for equal treatment claims); *see also* Compl. ¶¶ 7 ("Defendant's adopted and implemented policy intentionally denies and has the effect of denying girls equal athletic opportunities."), 76 ("The MPA's athletics participation bylaw discriminates on the basis of sex against girls in both its language and effect.").

For effective accommodation, the Complaint alleges, among other things, that "[g]irl athletes and their families have an interest, and have expressed this interest to schools and MDOE, in female-only sports teams and competitions that effectively accommodate their interests and abilities," and Defendant's ignoring this expressed interest "make[s] it impossible for girls' educational athletic interests and abilities to be fully and effectively accommodated," and causes "girls to have materially fewer athletic opportunities than they previously enjoyed because they no longer can compete in fair, exclusively girl competition." Compl. ¶¶ 126–31. For equal treatment, the Complaint gives three examples of trans-identifying males competing in multiple female sports. Because of the gender identity policy, each one of those sports across the MDOE system can no longer count as "female" toward the balance of equal treatment between males and females, as those sports now are, at best, co-ed. This is more than sufficient at the pleading stage. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (At motion to dismiss phase, courts should "presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

This Court should accordingly find the Policy Interpretation is inapplicable because Defendant is violating the statute itself, but also that even under the Policy Interpretation the United States has plead a plausible Title IX violation.

### B. DEFENDANT HAD CLEAR NOTICE THAT TITLE IX PROHIBITS ITS GENDER IDENTITY EXCEPTION.

Defendant argues (at 8-12) that the Spending Clause bars Title IX enforcement here because Defendant purportedly did not have clear notice that Title IX prohibits boys participating

in sports designated for girls. This argument fails because the statute, regulations, and multiple court decisions provided Defendant the required "clear notice" that it could be liable for its discriminatory gender identity policy. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).

In considering whether a law provides clear notice for purposes of the Spending Clause, courts begin with the text. *Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296–97. When the statutory text "is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Id.* at 296 (citations omitted). The *B.P.J.* Court confirmed that the "term 'sex' in the 1972 Title IX statute" and "the 1975 Title IX regulations *cannot plausibly* be interpreted to refer to anything other than biological sex." 146 S. Ct. at 2371 (emphasis added). "The ordinary meaning of the term 'sex' at the time of enactment in the early 1970s was biological sex and not gender identity, particularly in the sports context." *Id.* Thus, biological sex is not just the correct meaning, but the term "sex" cannot "plausibly be interpreted" any other way. *Id.; see also Loper Bright*, 603 U.S. at 409–12 (Statutes "have a single, best meaning" that is "'fixed at the time of enactment'" (citation omitted)).

Defendant thus cannot claim lack of notice based on its previous "[im]plausible" misreading of Title IX as encompassing and protecting "gender identity." According to its plain original public meaning from 1972, Title IX prohibits and has always prohibited discrimination based on sex, not gender identity, and does not allow trans-identifying males to compete in sports designated for girls. And even prior to *B.P.J.*, multiple references in the statute refer to sex as binary, which is inconsistent with the fluid concept of subjective gender identity. 20 U.S.C. § 1681(a)(8) (When "such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*." (emphasis

added)); *id.* § 1681(a)(2) (providing grace period for "institution which admits only students of *one sex* to being an institution which admits students of *both sexes*." (emphasis added)).

This clear notice is reinforced by the longstanding athletics regulation that Congress specifically requested and was issued shortly after the statute's enactment. *See Loper Bright*, 603 U.S. at 394; *see also Jackson*, 544 U.S. at 183–84 (finding Title IX regulations provide clear notice for retaliation claims). They too use sex as a binary term. 34 C.F.R. § 106.41(b) (referencing providing "team in a particular sport for members of *one sex* but operates or sponsors no such team for members of the *other sex*" (emphasis added)); *id* at § 106.41(c) (requiring "equal athletic opportunity for members of *both sexes*" (emphasis added)). And as explained above, the regulations authorize separation of athletic teams by sex, not gender identity. 34 C.F.R. § 106.41(b). And they do so "[b]y referring to contact sports and competitive skill," plainly recognizing "the inherent physical differences between biological men and biological women—as well as the safety and competitive fairness concerns that would arise if males were allowed to compete in female sports." *B.P.J.*, 146 S. Ct. at 2371.[13]

Defendant seemingly urges (at 9) that the statute itself (or the regulations) must explicitly prohibit allowing trans-identifying athletes to participate in athletics consistent with their "gender identity." But Congress need not "specifically identif[y] and proscribe[ ] in advance" every act for which liability may attach. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 666 (1985); *Jackson*, 544 U.S. at 183 (citing *Bennett* for this principle).

Indeed, in the Title IX context, the Supreme Court has rejected Spending Clause notice challenges to forms of intentional discrimination that the statute does not expressly mention

[13] Defendant points (at 11-12) to *B.P.J.*'s remarks about legislative discretion related to "medical and scientific uncertainty." Those remarks specifically related to puberty blockers and hormones, 146 S. Ct. at 237–80, and are irrelevant here because Defendant's policy does not require or even mention puberty blockers or hormones.

because the Court's previous cases that "consistently interpreted" Title IX "to encompass diverse forms of intentional sex discrimination" provide the required clear notice. *Jackson*, 544 U.S. at 183. The *Jackson* Court found that despite not expressly mentioning "retaliation," Title IX's broad prohibition of intentional discrimination provided clear notice. *Id.* at 181–84. Similarly in *Davis v. Monroe County Board of Educ.*, 526 U.S. 629 (1999), the Court found the same for deliberate indifference to student-on-student harassment. *Id.* at 639-42. And the Court did so even when some Justices dissented on the ground that Title IX was best construed not to prohibit the challenged conduct at all, let alone clearly. *See Jackson*, 544 U.S. at 184–90 (Thomas, J., dissenting); *Davis*, 526 U.S. at 658–62 (Kennedy, J., dissenting).

Defendant points (at 9) to the unlawful Title IX regulations in place in 2024 that expressly listed gender identity. But Defendant had notice of the unlawfulness of that short-lived version of the regulation since at least August 16, 2024, when the Supreme Court relayed that "all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to . . . the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation *and gender identity*." *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 867 (2024) (emphasis added).

Moreover, Defendant reaffirmed its contractual assurances with both USDOE and HHS promising that it would comply with Title IX in December 2024 and again in December 2025. In December 2024, beyond the Supreme Court's August 2024 notice, at least nine federal courts had rejected the regulation attempting to redefine sex as "gender identity" under Title IX because it subverted the original purpose of the law.[14] Moreover, since those December 2024 contractual

[14] *See, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Louisiana v. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024); *Oklahoma v. Cardona*, 743 F. Supp. 3d 1314 (W.D. Okla. 2024); *Arkansas v. Dep't of Educ.*, 742 F. Supp. 3d 919 (E.D. Mo. 2024); *see id.* at 940–41 (citing cases and noting each court has enjoined "implementation of the Rule" and "[n]o court has denied the requested relief").

assurances, Defendant has drawn down approximately $342,000,000 from USDOE and $670,000 from HHS.[15] Defendant cannot cry foul when it kept taking the federal government's money after all the above clear notice that its implausible interpretation of Title IX was incorrect.[16] This Court should accordingly reject its Spending Clause challenge.

### C. DEFENDANT VIOLATED ITS CONTRACTUAL ASSURANCES.

Count II plausibly alleges that Defendant materially breached its contractual assurances and that this breach has caused the United States damages. Compl. ¶¶ 160–64. Defendant mischaracterizes (at 20-25) this contract clam as seeking to enforce Title IX itself. The claim instead seeks to enforce the contract (which has many terms beyond Title IX), and the United States can sue for damages for breach like any other contracting party.

Defendant points (at 20-22) to enforcement remedies for violation of the Title IX statute, but that is Count I. By contrast, Count II is a common law contract claim. Defendant also claims (at 24-25) lack of notice for damages. But "Spending Clause legislation" like Title IX is "much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (citations omitted)). And "[a] funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.* at 187. That includes for Title IX a "suit for compensatory damages." *Id.*

[15] This includes approximately $280,000,000 (USDOE) and $500,000 (HHS) since Executive Order 14201, 90 Fed. Reg. 9279 (Feb. 11, 2025); approximately $253,000,000 (USDOE) and $475,000 (HHS) since the United States filed suit, and approximately $30,000,000 (USDOE) and $250,000 (HHS) since *B.P.J.* was decided.

[16] Defendant points to a previous HHS assurance form (at 6), which HHS has recently updated, https://ocrportal.hhs.gov/ocr/aoc/aocContact.jsf; https://www.reginfo.gov/public/do/PRAOMBHistory?ombControlNumber=0945-0008. Defendant also characterizes (at 10-11) previous federal guidance, but gives an incomplete account. *See* U.S. Statement of Interest, *Soule v. Conn. Ass'n of Schs.*, No. 3:20cv201, (D. Conn. Mar. 24, 2020), ECF No. 75; USDOE, *Memorandum re Bostock* (Jan. 8, 2021), https://www.ed.gov/media/document/ogc-memorandum-01082021pdf-21166.pdf. Regardless, as already explained, Defendant has had clear notice from the Supreme Court since August 2024 yet has still opted to enter into assurances and continue drawing money afterwards.

Defendant thus had notice that it was subject to damages traditionally available for contract breaches.

As above, the United States is not relying on the statute's enforcement mechanisms but seeking damages for breach of its contract. "[I]t is well established" that the United States has a "federal common law right" "to sue to enforce its own contracts without the necessity of a statute." *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980); *see also United States v. Florida*, 938 F.3d 1221, 1231 (11th Cir. 2019); *Rumley v. United States,* 285 F.2d 773, 777 (Ct. Cl. 1961) (holding federal government could seek damages for a common law breach of contract claim); *Marley v. United States*, 423 F.2d 324, 334–35 (Ct. Cl. 1970). When the United States sues as a party to its contracts, its rights and remedies for breach are the same as those of any private counterparty unless Congress clearly states otherwise. *United States v. Winstar Corp.*, 518 U.S. 839, 870 (1996); *id* at 898 (When "the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (citation omitted)). These remedies include damages for breach. *See Rumley*, 285 F.2d at 777; *Marley*, 423 F.2d at 334–35.

Congress may through statute remove the United States' common law right to sue to enforce its contracts, "but only if it offers 'extremely, even unmistakably clear' evidence of such intent." *Florida*, 938 F.3d at 1231 (quoting *Marion Cnty. Sch. Dist.*, 625 F.2d at 611); *see, e.g.*, 31 U.S.C. § 1341 (prohibiting government contract "for the payment of money before an appropriation is made unless authorized by law"). Defendant offers no such clear evidence here, it just points to authorized remedies for a violation of the statute. Defendant's argument conflicts with the Eleventh and Fifth Circuit precedents that have rejected the proposition that by establishing enforcement mechanisms in statutes like Title IX, "Congress nullified the United

States's existing right to sue to enforce contracts." *Florida*, 938 F.3d at 1231–22 (citing *Marion Cnty. Sch. Dist.*, 625 F.2d at 609–12). Congress "stated [its] intent to preserve other means of action which were not expressly set out in" in Title IX. *Marion Cnty. Sch. Dist.*, 625 F.2d at 612. This Court should similarly find Title IX does not clearly abrogate the United States' common law right to sue for damages for breach of its contracts.

Defendant's case citations (at 20-21, 24-25) are off point and many undermine its argument. The decades-old *Minor v. Northville Public Schools*, 605 F. Supp. 1185 (E.D. Mich. 1985), merely found that a contractual assurance created no third-party rights and that the third-party plaintiff's rights were tied to the statute. *Id.* at 1199. More recently in *Barnes*, the Supreme Court reaffirmed that "compensatory damages" traditionally *are* "available for breach of contract," while distinguishing *punitive* damages. 536 U.S. at 187–88. Similarly, *Cummings* merely limited the availability of damages for *emotional distress*, another "special form of damages." 596 U.S. at 216; *see id.* at 226. As to other kinds of damages, *Cummings* confirmed that "it is fair to consider recipients aware that, if they violate their promise to the Government, they will be subject to either damages or a court order to perform. Those are the usual forms of relief for breaching a legally enforceable commitment." *Id.* at 225.

This Court should accordingly find the United States has plausibly alleged an authorized, common law breach of contract claim for damages.

## V. CONCLUSION

This Court should deny Defendant's Motion for Judgment on the Pleadings, ECF No. 102, in its entirety.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

*/s/ Matthew J. Donnelly*

ANNA L. EDWARDS
MATTHEW J. DONNELLY
Attorneys
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 616-2788
Email: matthew.donnelly3@usdoj.gov

Dated: September 1, 2026