**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>MAINE DEPARTMENT OF EDUCATION,<br><br>*Defendant*. | ) | Case No. 1:25-cv-00173-SDN |

**PROPOSED BRIEF OF *AMICUS CURIAE* DO NO HARM, INC.,**
**IN SUPPORT OF UNITED STATES' OPPOSITION TO**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7.1(a), *amicus curiae* Do No Harm, Inc., states that (1) Do No Harm has no parent corporation; and (2) no corporations hold any stock in Do No Harm.

## INTEREST OF AMICUS CURIAE

Do No Harm, Inc., is a nonprofit membership organization that includes over 54,000 physicians, nurses, medical students, patients, and policymakers. Do No Harm is committed to ensuring that the practice of medicine is driven by scientific evidence rather than ideology. In recent years, the practice of sex-denying interventions, euphemistically known as "gender-affirming care," has become more common despite the serious harm caused by those medical interventions and the complete lack of reliable evidence for any benefit resulting from them. Part of Do No Harm's mission is to ensure that courts have a proper understanding of the danger of these medical interventions. Do No Harm submits this brief to help the Court understand why Title IX forbids—and science does not support—identity-based exceptions to sex-based sports teams.

## INTRODUCTION

Maine rejects law and science. Its choice to separate sports by sex and then carve an exception based on an athlete's perceived identity violates Title IX and ignores medical evidence.

First, Maine's identity-based exception to its sex-separated teams violates Title IX. As *West Virginia v. B.P.J.* reinforces, Title IX's biologically grounded safety and fairness goals required Maine to divide its teams by sex alone. *See* 146 S. Ct. 2356 (2026). Maine's permitting males to join female teams ignored why it could split males and females in the first place—biology.

Second, and as *B.P.J.* confirms, no medical evidence supports the claim that subjecting a male athlete to sex-rejecting interventions removes the advantage he has with respect to females.[1] That lack of evidence is no surprise. Sex-rejecting interventions are experimental, and all evidence about them is weak. At bottom, no child or adolescent should receive such interventions.

[1] These interventions include drugs to stop puberty and induce traits associated with females. *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices,* 9–11, 91, 116, 125, U.S. DEP'T OF HEALTH & HUM. SERV., OFF. OF POPULATION AFFS. (Nov. 19, 2025), https://perma.cc/3W5Q-TQC6.

Unfortunately, there are two sets of victims in this case: the women and girls whose sports have been taken from them, and the males suffering from gender dysphoria who are often subjected to dangerous and unproven physical interventions to serve a psychological disorder.[2] Thus, this Court should deny the motion for judgment on the pleadings and restore sanity to Maine's sports.

## ARGUMENT

Do No Harm first explains how Title IX—as understood in *B.P.J.*—requires Maine to protect women's and girls' sports. Do No Harm then describes the complete lack of evidence for the sex-denying interventions that some say justify forcing females to compete with males.

### I. Title IX Proscribes Identity-Based Exceptions to Sex-Separated Sports Teams.

The *B.P.J.* Court's interpretation of Title IX's text means two things for this case. First, Title IX's words place biological constraints on federal funding recipients. Second, Maine has exceeded Title IX's biological bounds by allowing males to compete on female teams.

#### A. Funding recipients may create either co-ed or sex-based sports teams.

*B.P.J.* stands for a scientific principle: "sex" in Title IX and its regulations means biological sex, and biology provides the safety and fairness justifications for sex-based sports. Because of that principle, sex-based teams are often required to preserve safety and fairness for females.

Begin with *B.P.J.*'s scientific principle, which bars Maine from organizing sports teams in a way that discriminates against females. The Supreme Court held that when Title IX prohibits "discrimination" "on the basis of sex," the word sex "cannot plausibly be interpreted to refer to anything other than biological sex." 146 S. Ct. at 2371. In turn, the 1975 Title IX regulations require "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Putting the

---

[2] A perceived inconsistency between one's biological sex and perceived gender identity can lead to psychological distress, resulting in a diagnosis of "gender dysphoria." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451–52 (5th ed. 2013).

two together, *B.P.J.* settles that the law demands "equal athletic opportunity" for females.

That leaves Maine with two options. First, there are co-ed teams. Under Title IX, a funding recipient may open its teams to participation by both males and females. The 1975 regulations confirm this baseline rule: in "[g]eneral," "no recipient shall provide any such athletics separately on [the] basis [of sex]." 34 C.F.R. § 106.41(a).

But in many contexts, mixed-sex teams could deny "equal athletic opportunity" to females. *Id.* § 106.41(c). *B.P.J.* shows how: "in contact sports, forcing female athletes to compete against males can create significant safety risks. And in virtually all competitive sports, forcing female athletes to compete against males can undermine competitive fairness." 146 S. Ct. at 2367.

Therefore, funding recipients must often separate teams by sex to comply with Title IX. The Title IX regulations explain that "[n]otwithstanding" the baseline bar on separating teams by sex, a "recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). *B.P.J.* explains why: "because of the biological differences between the sexes," which give rise to concerns about safety and fairness. 146 S. Ct. at 2371–72.

### B. Allowing males in females' sports violates Title IX.

By ignoring the statute's biological foundations, Maine violates Title IX—in two ways. First, Maine allows biological males to play on the women's and girls' teams, so its separation of the sexes is not sanctioned by Title IX's exclusive safety and fairness justifications for separation. Second, Maine endangers women and girls and denies them fair play by forcing them to compete alongside males, which defies the law's overarching requirement of equal opportunity in sports.

*First*, Maine's exception for males who identify as women or girls eviscerates Title IX's justification for sex-separated teams. As discussed, the regulations generally prohibit separating

teams by sex. But they permit deviation from that default where doing so is tied to "the inherent physical differences between biological women and biological men." *B.P.J.*, 146 S. Ct. at 2371. So, once Maine forced females to compete with males, its separation was no longer tied to biology.

*Second*, and independently, Maine's allowing males to compete in women's and girls' sports discriminates against females in contravention of Title IX and its regulations. The regulation requires funding recipients to "provide equal athletic opportunity for members of both sexes," 34 C.F.R. § 106.41(c). Yet the presence of a single biological male eliminates equal opportunity because "sports are generally zero sum." *B.P.J.*, 146 S. Ct. at 2372. As *B.P.J.* says, "[a]llowing a biological male athlete to compete on a girls' team *necessarily* displaces or disadvantages a female athlete—replacing her on the roster, knocking her out of the starting lineup, reducing her playing time, depriving her of a medal, and the like." *Id.* (emphasis in original).

*Third*, though *B.P.J.* formally reserved the question at issue in this case, *see id*. at 2367 n.1, the Court made clear that it declined to decide whether Title IX protects women's and girls' sports from biological men simply because "these cases do not present" that "distinct question." *Id.* Since the illegality of identity-based exceptions to sex-separated teams was not before the Court in *B.P.J.*, it did not (and could not) formally decide that issue. Yet the meaning of Title IX's text articulated in *B.P.J.* binds this Court when applying that text in a different case. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005). And, as discussed, the illegality of identity-based exceptions to sex-separated teams follows from *B.P.J.*'s explanation of Title IX's biological basis.

## II. Medical Evidence Reveals Sex-Denying Interventions Are Unproven and Risky.

Title IX's biological justification for separating teams accords with science. But exceptions for males who identify as females do not, even if those males have undergone sex-denying interventions. As *B.P.J.* reports, there "is no current evidence that testosterone suppression or

gender-affirming hormone treatment eliminates" the male "advantage" in sports. 146 S. Ct. at 2369 (quoting Int'l Olympic Comm., *Policy on the Protection of the Female (Women's) Category in Olympic Sport and Guiding Considerations for International Federations and Sports Governing Bodies* 2, 3 (Mar. 26, 2026)). That lack of proof is unsurprising since *all* evidence about sex-denying interventions is inadequate. Given the poor understanding of these interventions, children and adolescents should not be subjected to them. At the least, Title IX should not be contorted to incentivize children and adolescents to seek those treatments to participate in opposite sex sports.

### A. Systematic reviews are the gold standard of medical evidence.

Although the proper practice of medicine is driven by evidence, not all medical evidence is created equal. Researchers have thus spent decades refining the process that clinicians use to assess the medical evidence supporting a particular medical intervention. That process—often referred to as the practice of "evidence-based medicine"—outlines a hierarchy of medical evidence based on the confidence a clinician can place in a particular source of evidence. *See* Gordon Guyatt et al., *Users' Guides to the Medical Literature: Essentials of Evidence-Based Clinical Practice* 15 fig. 2-3, JAMAEVIDENCE (3d ed. 2015) ("Evidence-Based Medicine User Guide"). The "pyramid of standards of evidence" reflects the hierarchy of reliability for evidence in medicine:



*See Independent Review of Gender Identity Services for Children and Young People: Final Report* at 55, NAT'L HEALTH SERV. ENG. (Apr. 2024), https://perma.cc/KM5C-49EZ ("Cass Review"). As the pyramid shows, "systematic reviews" are at the top of the hierarchy of medical evidence. At the bottom of the hierarchy is clinical experience—*i.e.*, "the unsystematic observations of individual clinicians." Evidence-Based Medicine User Guide at 15.

Systematic reviews provide the greatest insight into the medical evidence underpinning a particular intervention because they account for all relevant studies, assess those individual studies for areas of potential scientific bias, and thus assess the *reliability* of the *entire* evidence base. *See id*. at 274-76. To determine the certainty of the evidence, researchers frequently use tools such as the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) method. *See id.* at 16-17. In the GRADE system, researchers rate the evidence using specified criteria. "In the context of a systematic review, the ratings of the quality of evidence reflect the extent of our confidence that the estimates of the effect are correct." Howard Balshem et al., *GRADE Guidelines: 3. Rating the Quality of Evidence*, 64 J. CLINICAL EPIDEMIOLOGY 401, 403 (2011). This resulting rating of the evidence is either "high, moderate, low, or very low." Evidence-Based Medicine Users Guide at 16. The following definitions explain what the various levels mean:

> High Quality Evidence: "We are *very confident* that the true effect lies close to that of the estimate of the effect."
>
> Moderate Quality Evidence: "We are *moderately confident* in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different."
> Low Quality Evidence: "Our *confidence* in the effect estimate *is limited*: The true effect may be *substantially different* from the estimate of the effect."
>
> Very Low Quality Evidence: "We have *very little confidence* in the effect estimate: The true effect *is likely to be substantially different* from the estimate of effect."

Balshem, *supra* at 404 tbl.2 (emphasis added). Thus, when evidence is deemed "low" or "very low" quality, that means researchers have "limited" or "very little confidence" that the results of the study reflect the truth; indeed, the truth may or likely will "be substantially different."

Finally, after analyzing all relevant studies, the researchers will "summarize the results." Evidence-Based Medicine User Guide at 275. This process can include a quantitative synthesis or "meta-analysis" of data that provides an overview to clinicians. *See id.* at 275-76. The end result is a study of studies—a comprehensive look at the evidence that accounts for the reliability of the individual studies. In short, systematic reviews are the most reliable form of medical evidence.

**B. Systematic reviews show evidence for sex-denying interventions is weak.**

Several entities and institutions have conducted systematic reviews to assess the evidence underlying the use of puberty blockers and cross-sex hormones as a treatment for minors with gender dysphoria. All have concluded that the evidence underlying medical interventions for gender dysphoria in minors is weak; zero have come out the other way.

1. *Finland.* The first systematic review came in 2019 when Finland's Ministry of Social Affairs and Health completed its review of the medical evidence. In light of this evidence review, Finland's healthcare authority concluded that "gender reassignment of minors is an experimental practice." *Recommendation of the Council for Choices in Health Care in Finland (PALKO/COHERE Finland): Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors* at 8, PALVELUVALIKOIMA (Nov. 6, 2020), https://perma.cc/PF72-H654 (unofficial translation by the Society for Evidence Based Gender Medicine (SEGM)). This conclusion was because "[t]he reliability of the existing studies" is "highly uncertain." *Id.* at 7.

2. *The Cass Review Interim Report*. Next, in 2020, the United Kingdom's National Institute for Health and Care Excellence (NICE) completed its review of the evidence for using

puberty blockers and cross-sex hormones on minors with gender dysphoria to aid the Cass Review, an independent review commissioned by the United Kingdom's National Health Service. *See NICE Evidence Reviews*, THE CASS REV., https://perma.cc/APZ2-W8MS. The result was two separate systematic reviews—one for puberty blockers and one for cross-sex hormones. *Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*, NAT'L INST. FOR HEALTH & CARE EXCELLENCE (Oct. 2020), https://perma.cc/F9FF-ZPFR ("NICE – Review of Puberty Blockers"); *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria*, Nat'l Inst. for Health & Care Excellence (Oct. 2020), https://perma.cc/U49T-JLGJ ("NICE – Review of Cross-Sex Hormones"). The review of puberty blockers concluded that the relevant studies were "all small, uncontrolled observational studies, which are subject to bias and confounding, and all the results are of very low certainty using [a] modified GRADE" methodology. NICE – Review of Puberty Blockers at 13. Similarly, in the review of cross-sex hormones, NICE concluded that the relevant studies were "uncontrolled observational studies, which are subject to bias and confounding and were of very low certainty using [a] modified GRADE" methodology. NICE – Review of Cross-Sex Hormones at 13.

3. *The State of Florida*. In 2022, researchers at Canada's McMaster University—a world-renowned institution in evidence-based medicine—completed a systematic review at the request of the Florida Agency for Health Care Administration. *See* Romina Brignardello-Petersen & Wojtek Wiercioch, *Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence* 5 (May 16, 2022), https://perma.cc/S4A3-NKDY. They too found the evidence supporting these interventions was weak. "Due to the important limitations in the body of evidence," they concluded, "there is great uncertainty about the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria." *Id.*

4. *Sweden*. In 2023, Swedish researchers published a systematic review that was commissioned by Sweden's Agency for Health Technology and Assessment of Social Services. *See* Jonas F. Ludvigsson et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, 112 ACTA PAEDIATRICA 2279 (2023), https://perma.cc/E7S9-7CLB. The review concluded that the "[e]vidence to assess the effects of hormone treatment" on (among other things) mental health in minors "with gender dysphoria is insufficient." *Id.* at 2280. Specifically, it noted that "[l]ong-term effects of hormone therapy on psychosocial health are unknown," and using puberty blockers to treat gender dysphoria "should be considered experimental treatment." *Id.*

5. *The Cass Review Final Report*. More recently, researchers from York University published a series of systematic reviews as part of the Cass Review. The researchers conducted systematic reviews of the evidence for both puberty blockers and cross-sex hormones. *See* Jo Taylor et al., *Interventions To Suppress Puberty in Adolescents Experiencing Gender Dysphoria or Incongruence: A Systematic Review*, ARCHIVES DISEASE CHILDHOOD 1 (2024), https://perma.cc/UFL5-7RPB ("Taylor, PB"); Jo Taylor et al., *Masculinising and Feminising Hormone Interventions for Adolescents Experiencing Gender Dysphoria or Incongruence: A Systematic Review*, ARCHIVES DISEASE CHILDHOOD 1 (2024), https://perma.cc/ACK3-XB8D ("Taylor, CSH"). In the puberty blockers review, the researchers determined that their "findings add to other systematic reviews in concluding there is insufficient and/or inconsistent evidence about the effects of puberty suppression on gender dysphoria, body satisfaction, psychological and psychosocial health, cognitive development, cardiometabolic risk and fertility." Taylor, PB at 12. Similarly, in the cross-sex hormones review, the researchers concluded the "findings add to other systematic reviews in concluding there is insufficient and/or inconsistent evidence about the risks

and benefits of hormone interventions in this population." Taylor, CSH at 6.

6. *U.S. Department of Health and Human Services*. At the end of last year, HHS published an overview of systematic reviews (an "umbrella review") that "found the overall quality of evidence concerning the effects of" pediatric sex-denying interventions "on psychological outcomes, quality of life, regret, or long-term health, is very low." U.S. Dep't of Health & Hum. Serv., *supra* at 13. The umbrella review added that the "[e]vidence for harms associated with pediatric medical transition in systematic reviews is also sparse." *Id.* The review concluded that "there is considerable uncertainty regarding" the "psychological and long-term health outcomes" of those who are subjected to sex-denying interventions. *Id.* at 100.

* * *

To summarize, all these reviews concluded the same thing: there is no reliable evidence to justify the use of puberty blockers and cross-sex hormones as a treatment for gender dysphoria in minors. And a critical study issued just months ago underscores this conclusion. *See* Sami-Matti Ruuska et al., *Psychiatric Morbidity Among Adolescents and Young Adults Who Contacted Specialised Gender Identity Services in Finland in 1996-2019: A Register Study*, ACTA PAEDIATRICA (2026), https://perma.cc/86EP-YAQB. In a massive study of over 2,000 individuals, aged 23 and under, who were referred to Finland's gender clinics, researchers found that, "[a]mong adolescents who underwent medical gender reassignment, psychiatric morbidity *increased markedly*" and that "[p]sychiatric needs do not subside after medical gender reassignment." *Id.* (emphasis added). As the Wall Street Journal put it: "The results are a rebuke to those who call for irreversible interventions for children." Editorial Board, *Finland's Lessons on Transgender Children*, WALL ST. J. (Apr. 16, 2026), https://perma.cc/3TR4-EMMZ.

## CONCLUSION

This Court should deny Defendant's motion for judgment on the pleadings.

Dated: September 8, 2026

Respectfully submitted,

*<u>/s/ John E. Baldacci, Jr.</u>*
John E. Baldacci, Jr., Bar No. 5773
STEVE SMITH TRIAL LAWYERS
191 Water Street
Augusta, ME 04330
Tel: (207) 622-3711
jack@americantrialgroup.com

*<u>/s/ David H. Thompson</u>*
David H. Thompson* (D.C. Bar No. 450503)
Adam P. Laxalt* (D.C. Bar No. 1670779)
John D. Ramer* (D.C. Bar No. 90002236)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
alaxalt@cooperkirk.com
jramer@cooperkirk.com

*Pro Hac Vice *forthcoming*

*Counsel for* Amicus Curiae *Do No Harm, Inc.*

**CERTIFICATE OF SERVICE**

Counsel certifies that the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 8th day of September, 2026.

*/s/ John E. Baldacci, Jr.*
John E. Baldacci, Jr.