**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:25-cv-00173-SDN |
| MAINE DEPARTMENT OF EDUCATION, | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

In its brief, the United States waits until page 19 to address a critical and dispositive question in this case: did Title IX's prohibition on sex discrimination clearly and unambiguously require funding recipients to exclude transgender girls from girls' sports? Since the Maine Department of Education (MDOE) filed the instant Motion, a district court has answered this question in a nearly identical case, concluding that it did not. *United States v. California Interscholastic Fed'n*, No. 25-cv-01485, 2026 WL 2575930 (C.D. Cal. Aug. 31, 2026). This Court should reach the same answer here and enter judgment for MDOE. Judgment is also warranted because Title IX does not require exclusion of transgender girls and the United States is not entitled to damages, though the Court need not reach these questions given the Spending Clause's clear bar.

**I. Plaintiff's Claims Are Barred by the Spending Clause.**

The United States first contends that Title IX's text provided clear notice that transgender girls must be excluded from girls' sports. Def.'s Br. (ECF No. 105) at 20. Because the text says no such thing and, in fact, does not speak to athletics at all, the United States instead contends that MDOE should have understood exclusion of transgender girls to be required because "sex" in Title IX refers to "biological sex and not gender identity." *Id*. Putting aside that this question about the meaning of "sex" was unresolved until the U.S. Supreme Court decided *West Virginia v. B.P.J.*, 146 S.Ct. 2356 (2026)—just over two months ago and well after the acceptance of federal funds at issue—the definition of "sex" far from establishes what Title IX requires regarding transgender girls' participation in sports. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("The question isn't just what 'sex' meant, but what [the statute] says about it."). Numerous courts have held that discrimination based on gender identity is discrimination based on "biological" or birth sex. *See, e.g.*, *id.* at 660 ("[I]t is impossible to discriminate against a

person for being . . . transgender without discriminating against that individual based on sex.”). Thus, even if Title IX protects against only discrimination based on “biological” sex, that does not mean its protections do not also reach gender identity discrimination. And it certainly does not go even farther, *requiring* transgender girls’ exclusion from girls’ sports.

Finding no support for its position—much less clear notice—in the text, the United States points to Title IX’s implementing regulations, again focusing on the definition of sex. Def.’s Br. at 21 (“[The regulations] use sex as a binary term.”). This again misses the mark. The definition of “sex” fails to resolve the extent of Title IX’s protections against gender identity discrimination, much less establish a requirement that transgender girls be *excluded* from girls’ sports. The United States also argues that clear notice could be inferred because the regulations “authorize” sex-separated teams due to “inherent physical differences” and “safety and competitive fairness concerns.” Def. Br. at 21. But the regulations do not require sex separation. *See* 34 C.F.R. § 106.41(b). They state only that a recipient “*may*” operate sex-separated teams where selection is “based upon competitive skill or the activity involved is a contact sport.” *Id*. (emphasis added). In fact, the regulations *require* that in some cases, members of one sex be allowed to try out for a team of another sex. *See id*. The United States fails to explain how these regulations provided clear notice that “biological” boys and girls must be completely separated.

Finally, the United States contends that “multiple court decisions” provided clear notice. Def.’s Br. at 19. However, the United States offers few citations to support this assertion. *See id*. at 20-23. It first cites *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006), and *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022)—neither of which address sports or transgender individuals, and only one of which addresses Title IX. Put simply, neither announces a requirement that recipients exclude transgender girls from girls’ sports.

The United States then discusses several more recent cases that do relate to the participation of transgender individuals in sports.[1] This includes brief references to *B.P.J.* that, even if construed as an argument that *B.P.J.* provided clear notice, would fail. *B.P.J.* expressly reserved the question of whether Title IX permits inclusive policies like those challenged here. *See* 146 S.Ct. at 2367 n.1. *B.P.J.*, therefore, does not supply clear notice.[2]

The United States also notes that the Supreme Court declined to stay an injunction of the U.S. Department of Education's (USDOE's) Title IX regulation defining sex discrimination to include gender identity discrimination and cites several 2024 decisions "reject[ing]" that regulation. Def.'s Br. at 22 & n.14. But rejecting a regulation that interpreted Title IX to cover gender identity is not the same as requiring schools to *exclude* transgender girls. The United States fails to explain how any of this provided clear notice that Title IX prohibits the inclusion of transgender girls on girls' sports teams.

Moreover, the United States' survey of cherry-picked caselaw ignores the complex backdrop against which States have operated and fails to acknowledge the numerous decisions holding that Title IX protects transgender individuals. *See, e.g.*, *Parents for Priv. v. Barr,* 949 F.3d 1210, 1227–29 (9th Cir. 2020) (rejecting Title IX challenge to policy permitting access to facilities based on gender identity and stating that sex-separated facilities need not "be segregated based only on biological sex"); *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025);

[1] Even if these cases did provide clear notice—which they did not—MDOE could only face potential liability with respect to federal funding it accepted after receiving clear notice. Judgment for MDOE would, therefore, be required to the extent Plaintiff's claims pre-date clear notice. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) (rejecting "post acceptance or 'retroactive' conditions").

[2] The United States also cites *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), and *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), for the proposition that Title IX can provide clear notice of implied obligations. Def.'s Br. at 21-22. But both involved conduct—retaliation and harassment—that the Court found flowed naturally from Title IX's text. *See Jackson*, 544 U.S. at 183; *Davis*, 526 at 643-48. There is no analogous textual hook for a mandate to exclude transgender girls, a question *B.P.J.* expressly declined to decide. 146 S. Ct. at 2367 n.1.

*B.P.J. v. W. Va. State Bd. of Educ.,* 98 F.4th 542, 563–65 (4th Cir. 2024), *rev'd sub nom. West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026). It waves away the federal government's inconsistent and flip-flopping positions as to what Title IX requires, ignoring altogether DOJ's previous position that categorically excluding transgender girls from girls' sports violates Title IX and dismissing as "short-lived" USDOE's regulation defining sex discrimination to include gender identity discrimination.[3] It relegates to a footnote the U.S. Department of Health and Human Services assurances form used *until this summer* that stated that Title IX protects against gender identity discrimination. Def.'s Br. at 23 n.16.

Against this backdrop, courts have repeatedly recognized that what Title IX permits or requires regarding transgender participation in athletics is not clear. *See Female Athletes United v. Ellison*, 172 F.4th 1019, 1029 (8th Cir. 2026) ("[T]here can be no dispute that whether Title IX . . . permits . . . the participation of transgender athletes in female athletics remains an open question of law."); *B.P.J.*, 146 S.Ct. at 2383 (Gorsuch, J. concurring) ("Nothing in Title IX clearly and unambiguously alerts funding recipients that they are prohibited from restricting a school-sponsored sports team to biological . . . girls."); *id.* at 2367 n.1 (leaving unresolved whether "schools may allow [transgender girls] to participate on girls' . . . sports teams").

Less than two weeks ago, the Central District of California dismissed with prejudice a nearly identical case precisely because funding recipients lacked clear notice of what was required under Title IX. *California Interscholastic*, 2026 WL 2575930, at *11. After noting that *B.P.J.* "declined to decide" whether Title IX permits transgender girls to participate on girls' teams, the court concluded that Title IX and its regulations "permit biological sex-separation and

[3] The United States says MDOE's recounting of federal guidance is "incomplete," pointing to a 2021 DOJ statement of interest and a 2021 USDOE memorandum. Def.'s Br. at 23 n.16. Far from supporting its argument, these documents further illustrate the federal government's inconsistent positions, underscoring the lack of clear notice.

require equal treatment," but "do not clearly communicate Plaintiff's further condition that biological sex must control every eligibility . . . decision regardless of gender identity." *Id.* at *5, *8. The court found no Ninth Circuit case "alert[ing] California that Title IX unmistakably required . . . categorical exclusion" and noted "[t]he national case law was similarly unsettled." *Id.* at *8-9. Finally, it concluded that the Executive Branch's "conflicting" interpretations "confirm[]" that Title IX and its regulations "did not provide clear notice." *Id.* at *11.

Because MDOE similarly lacked clear notice, the Spending Clause also bars the United States' claims against MDOE.[4] The Court should, therefore, enter judgment for MDOE.

## II. Title IX Does Not Require Exclusion of Transgender Girls from Girls' Sports.

The Court need not reach the question of what Title IX requires, but if it does, it should enter judgment for MDOE.[5] Put simply, Title IX does not require funding recipients to exclude transgender girls from girls' sports. Title IX and its regulations contain no such express requirement. The United States asks instead that the Court read such a requirement into the regulations through flawed inferences. First, it repeatedly claims that "biological sex" is the only permissible basis for separating sports teams.[6] This is wrong. Title IX prohibits sex discrimination; it says nothing about whether teams may be separated based on other characteristics. Indeed, the composition of sports teams is often determined by other means or

---

[4] Because the Spending Clause bars the Title IX claim, it also bars the contractual assurances claim. *Id.* at *12 ("An assurance to comply with Title IX cannot supply a term Title IX, its implementing regulations, or then-existing caselaw did not clearly impose").

[5] The United States urges the Court to decide what Title IX requires, arguing that "if there is never clear notice because a court never reached the Title IX issue, that would absurdly leave Defendant free to violate Title IX in perpetuity." Def.'s Br. at 6 n.4. This ignores established processes for agencies to promulgate new rules through notice-and-comment rulemaking. The Court is free to address only the Spending Clause issue. *See, e.g.*, *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, No. 23-1197, slip op. at 4 & n.1 (U.S. June 23, 2026); *California Interscholastic*, 2026 WL 2575930, at *11.

[6] *See, e.g.,* Def.'s Br. at 1 ("But 'biological sex' is the only non-discriminatory reason educational programs can separate sports in the first place."), 7 ("Biological 'sex' is the only grounding justification that educational programs can use to separate sports in the first place.").

characteristics, such as age, weight, talent, level of experience, seniority, attendance, completion of fitness tests, homeroom assignment, skill growth, random selection, or balanced drafts that seek to mix beginners with more experienced players.

The United States frames MDOE's policy as a "failure to properly separate by sex." Def.'s Br. at 16. But Title IX does not require sex separation. *See* 34 C.F.R. § 106.41(b); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 610-11 (6th Cir. 2024) ("[T]he regulations permit, but do not require, aid recipients to organize their athletics programs . . . by biological sex. Schools could, for example, choose coeducational teams . . . . [T]hey could also separate programs . . . by gender identity."); *Parents for Priv.*, 949 F.3d at 1227; *A.C. ex rel. M.C. v. Metro Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023). Nor, if an educational program chooses to separate by sex, does it require complete sex separation. *See* 34 C.F.R. § 106.41(b). Title IX provides States latitude to adopt inclusive policies, consistent with its overarching purpose: "equal athletic opportunity." The complaint fails to plead facts establishing that girls have been denied that opportunity. Judgment for MDOE is, therefore, warranted.

**III. Plaintiff's Claim for Damages is Barred by Title IX.**

The United States mischaracterizes MDOE's position, claiming MDOE argues that "the United States cannot sue for breach of the contractual assurances." Def.'s Br. at 1-2. MDOE challenged only the United States' ability to recover *damages*. The cases the United States cites to establish a right to sue do not help its position. In each case involving federal enforcement of contractual assurances, relief was limited to prospective, equitable relief. *See, e.g.*, *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 609-13 (5th Cir. 1980); *see also United States v. Florida*, 938 F.3d 1221, 1231-33 (11th Cir. 2019).

Prospective, equitable relief was all that was available given the express limits Congress imposed on federal enforcement of Title IX. This includes limiting enforcement to "effect[ing]" "[c]ompliance," and mandating specific administrative processes for any federal action terminating funding. 20 U.S.C. § 1682.[7] These limitations would be rendered meaningless if the United States could simply claim breach of contract, rescind the contract, and recoup all funds disbursed.[8] Such an extraordinary outcome would also stand in stark contrast to the history of federal enforcement—the United States does not point to a single case where it sought, much less received, damages for breach of contractual assurances—and upend the compliance-oriented nature of civil rights Spending Clause legislation. *See, e.g.*, *United States v. President & Fellows of Harv. Coll.*, No. 26-11352, 2026 WL 2343193, at *2 (D. Mass. Aug. 13, 2026) ("Congress's intent was not to penalize a wayward funding recipient but instead to incentivize it to bring itself into compliance."). Title IX was designed to end discrimination through prospective compliance, not to impose retroactive penalties or institution-wide forfeitures. *See Guardians Ass'n v. Civil Serv. Comm'n of N.Y.C.*, 463 U.S. 582, 597 (1983) ("'[I]n no [Spending Clause] case . . . have we required' a state to provide money to plaintiffs, much less required a state to assume more burdensome obligations." The United States' contract theory seeks to convert Title IX's compliance-oriented statutory scheme into a draconian remedy Congress did not authorize. The Court should reject the United States' attempt to circumvent the statutory limits on its authority and enter judgment for MDOE on the damages claim.

* * *

MDOE respectfully requests that its Motion for Judgment on the Pleadings be granted.

---

[7] The relevant regulations similarly limit enforcement to "induc[ing]" compliance. *See* 28 C.F.R. § 42.108; *id.* § 54.605 (adopting Title VI regulations for Title IX enforcement).

[8] It appears the United States intends to do just that. *See* Def.'s Br. at 23 n.15 (describing all funds expended to MDOE, rather than the amount tied to the alleged breach); *see also* Compl. (ECF No. 1) ¶ 162 (alleging the breach was "material," a necessary element for rescission of the contract).

Dated: September 11, 2026

AARON M. FREY
Attorney General

/s/ Sarah A. Forster
SARAH A. FORSTER
Assistant Attorney General
Sarah.Forster@maine.gov
KATHERINE W. THOMPSON
Special Counsel
Kate.Thompson@maine.gov
Office of the Attorney General
State House Station 6
Augusta, ME 04333
Telephone: (207) 626-8800